933 A.2d 405

**ARCHERS GLEN PARTNERS, INC., et al.**

v.

**Betty GARNER, et al.**

No. 1281, Sept. Term, 2006.

Court of Special Appeals of Maryland.

July 6, 2007.

Reconsideration Denied Oct. 31, 2007.

Megan M. Bramble (Norman D. Rivera, Rifkin, Livingston, Levitan and Silver, LLC, on the brief), Greenbelt; M. Andree Green (George R.H. Johnson, on the brief), Upper Marlboro, for Appellant.

G. Macy Nelson (Paul N. DeSantis, on the brief), Towson, for Appellee.

JAMES R. EYLER, ADKINS and RAYMOND G. THIEME, (Ret., specially assigned), JJ.

EYLER, JAMES R., Judge.

This case requires an analysis of the relationship between land use planning documents and subdivision regulations in Prince George's County.

Archers Glen Partners, Inc. ("the developer") submitted a preliminary subdivision plan to the Prince George's County Planning Board of the Maryland–National Capital Park and Planning Commission ("the Planning Board") for approval.[1] The Planning Board approved the preliminary subdivision plan, and after a prior appeal to this Court, which resulted in a remand, it affirmed its prior approval. Several citizens filed a petition for judicial review of the Planning Board's re-approval in the Circuit Court for Prince George's County. The circuit court remanded the matter to the Planning Board for further proceedings. The developer and the Planning Board appealed to this Court (collectively "appellants"). We shall reverse the judgment, thereby affirming the Planning Board's decision.

## Factual and Procedural Background

On September 24, 2002, Washington Management and Development Company, Inc, the predecessor of the developer, filed an application for approval of a preliminary subdivision plan for a subdivision, known as Archers Glen, to consist of 47 lots. The developer proposed to retain an existing dwelling and to build 46 new single family dwellings. The property involved consisted of 236.45 acres, and was located near Baden–Westwood Road and Bald Eagle School Road, in the southeastern quarter of the County. The property was zoned

---

1. The Prince George's County Planning Board is comprised of those members of the Maryland–National Capital Park and Planning Commission("the Commission") who are appointed by the County government. In this opinion, when we refer to the Maryland–National Capital Park and Planning Commission generally, we shall refer to it as the Commission. When we refer to the Commission sitting as the County Planning Board, we shall refer to it as the Planning Board.

O–S (open space). At all relevant times, single family detached dwellings were a permitted use within that zone, with a density of 0.2 dwelling units per acre.[2]

The Planning Board's staff approved the developer's application and presented it to the Planning Board. On February 20, 2003, the Planning Board conducted an evidentiary hearing and, by resolution dated March 27, 2003, approved the preliminary subdivision plan, with nine conditions. Among other things, the Planning Board found that the developer's application was consistent with the land use provisions in the applicable plans, the County's General Plan and Master Plan, discussed below.

Several citizens filed a petition for judicial review in circuit court.[3] After the circuit court affirmed the Planning Board, the citizens appealed to this Court. In an unreported opinion, *Garner v. Prince George's County Planning Bd. of the Maryland–National Capital Park and Planning Comm'n,* No. 2715, Sept. Term 2003, 160 Md.App. 714, 718 (filed January 18, 2005), we vacated the circuit court's judgment and remanded the case with instructions to remand to the Planning Board for further proceedings. We explained that, with respect to the Planning Board's finding that the application was consistent with the applicable Plans, the Planning Board had failed to "articulate its decision with adequate specificity."

On June 23, 2005, after remand, the Planning Board held a hearing. By amended resolution dated September 29, 2005, the

2. According to the Planning Board, "[s]ection 27–442(a)(1)(b) of the Zoning Ordinance provides for varying lot size standards in the O–S Zone for a subdivision of 50 acres or more. The minimum lot size required of at least 60 percent of the lots is five acres. The applicant is allowed one 2–acre lot for every 50 acres of gross tract acres in the subdivision, with the minimum lot size of the remaining lots being three acres". In accordance with the above requirement, the developer proposed 29 lots containing a minimum of five acres, four lots containing between three and four acres, and fourteen lots containing between three and three and four tenths acres.

3. The petitioners were Betty Garner, Ross Williams, Janette and Charles Hosington and the Greater Baden Aquasco Citizens Association.

Planning Board again approved the preliminary subdivision plan.

Several citizens, appellees herein,[4] again petitioned for judicial review in circuit court. The circuit court, by opinion and order dated June 2, 2006, remanded the matter to the Planning Board for further "consideration and findings."

### Land use plans

#### *Biennial Plan*

Prince George's County has adopted four countywide general plans: one in 1964; another in 1982; an interim general plan known as the Biennial Growth Policy Plan ("Biennial Plan"), adopted by the County Council sitting as the District Council ("District Council"), in October, 2000; and the final general plan, adopted by the District Council in July, 2002 ("the General Plan"). The latter two Plans are relevant to this appeal.

As part of its continuing effort to better regulate growth, recognizing that the 1982 general plan was no longer adequate, and to implement a "smart growth" program, the District Council, by resolution approved on July 28, 1998, created "Commission 2000," "a broad-based advisory panel." The Commission's charge was to "recommend a comprehensive growth management plan for Prince George's County and a strategy to achieve it." The Commission's work resulted in the Biennial Plan, adopted in 2000.

Of significance here is that the Biennial Plan established three development tiers: Developed, Developing, and Rural. As the names imply, the Developed Tier included areas that were largely developed. The Developing Tier included areas where most new development would occur. The Rural Tier included agricultural, open space, and low-density housing

---

**4.** In addition to the petitioners named in footnote 1, Esther Naylor, Debra Naylor, Ruth Naylor, Susan and Scott Morrill, and Joyce Anderson joined in the second petition.

areas, where little development would occur. The property in question is located in the Rural Tier.

The growth objectives were stated as follows: "Capture at least 33 percent of the County's dwelling unit growth over the next 20 years within the Developed Tier; ... Capture up to 66 percent of the County's dwelling unit growth over the next 20 years within the Developing Tier;" and "Slow dwelling unit growth within the Rural Tier to 0.75 percent of total County-wide dwelling unit growth over the next 20 years." The District Council described the Biennial Plan as an interim plan (as is indicated by its name, "Biennial"), and included in the primary tasks for implementation the development of a new General Plan by 2002. As noted above, that was accomplished.

### The 2002 General Plan

The General Plan is divided into five parts: (1) an overview; (2) the development pattern, which includes the growth tiers; (3) infrastructure elements, providing policy guidance for environmental protection, transportation, and public facilities; (4) economic development, housing, and community character elements; and (5) implementation actions to "bring about the vision established by this General Plan."

The General Plan embraces and, "in some instances, modifies the goals, policies, and strategies of the [Biennial Plan]." The General Plan adopted the growth tier structure. One of the stated objectives for the Rural Tier, slightly different from the Biennial Plan, is to "capture [less than 1%] of the county's dwelling unit growth by 2025."

The stated "goals" for the Rural Tier are to "[1] to preserve environmentally sensitive features [2] retain sustainable agricultural land [3] allow large-lot estate residences [4] limit nonagricultural land uses [5] protect landowners' equity in their land [and 6] maintain the integrity of a rural transportation system."

The stated "policies" for the Rural Tier are to "[1] retain or enhance environmentally sensitive features and agricultural

resources [2] design future development to retain and enhance rural character [3] provide for a Rural Tier transportation system that helps protect open space, rural character, and environmental features and resources [and 4] public funds should not encourage further development in the Rural Tier."

It would consume an inordinate amount of space to fully describe the "strategies" to implement the "policies." They include revising tax regulations, purchasing development rights, developing programs supporting agriculture, identifying appropriate locations for future large-lot estate development through future master plans, and minimal funding of capital improvements.

Under "Implementation," the General Plan states:

The General Plan will only be effective to the extent that its goals and policies are implemented. Plan implementation will involve making choices concerning future development patterns, while taking into consideration the cost of providing needed infrastructure and protecting the environment. The fundamental challenge in making these critical choices for the county's future lies in deciding how to improve our county responsibly without being wasteful. This General Plan, which applies Smart Growth principles countywide, offers a range of policy choices for controlling sprawl and ensuring cost-effective use of public resources to maintain a high and sustainable quality of life. Implementation of this plan should be guided by the need to achieve the county's top growth policies. To do this, the county will need to regularly review, and where necessary, reorient, the way it implements and refines this General Plan, through the Biennial Policy updates, master and functional planning, and by regulatory revision. The four essential components of implementation include: intergovernmental cooperation and public participation[;] future planning activity[;] regulatory revisions[; and] Biennial Growth Policy updates.

According to the resolution by the District Council approving the General Plan, the General Plan amended the then

current master plans "with respect to countywide goals, objectives, policies, and strategies. . . ."

*Master Plan*

From time to time, the District Council has adopted master plans. Master plans address specific areas, as distinguished from being countywide, and, in part, make land use and policy recommendations at a more detailed level than a general plan. The property in question lies within the Subregion VI Study Area Master Plan, approved September, 1993, implemented through a sectional map amendment, approved May, 1994 ("Master Plan").

The Master Plan's stated "goal" is to "preserve the rural character of its area." The Plan contains fifteen objectives. Again, quoting at great length is not warranted, but the objectives include encouraging agriculture, open space, and encouraging new development "to be in harmony with the rural character of the area and to foster new forms of development which will preserve a significant part of the rural landscape."

The Master Plan states that it is "in accordance with" the then existing 1982 General Plan, with the exception of certain amendments. The amendments were specific in nature and included, *e.g.*, reclassification of a community activity center, replacing potential lake sites with flood plains, and adding road interchanges.

### This Court's unreported opinion

The Planning Board, in its first resolution, stated that the developer's application was consistent with the land use recommendations in the Master Plan and with guidelines for development in the Rural Tier, as stated in the General Plan. This Court concluded that the statement was not specific enough to permit meaningful judicial review and instructed that the case be remanded to the Planning Board for further proceedings.

In that opinion, we also commented on the status of the Master Plan and General Plan. After observing that generally, neither type of plan imposes mandatory criteria, we recognized a provision contained in the County's subdivision regulations, specifically, § 24–121(a)(5), Prince George's County Code. It provides that the subdivision plan

> shall conform to the area master plan, including maps and text, unless the Planning Board finds that events have occurred to render the relevant plan recommendations no longer appropriate or the District Council has not imposed the recommended zoning.

We went on to opine that the General Plan also guided the subdivision of land, despite the absence of any reference to it in § 24–121(a)(5). We concluded the discussion of the effect of the General Plan by stating:

> The parties apparently did not litigate this issue before the Planning Board, and the Board did not expressly decide the issue in its decision. Because we are vacating the judgment and remanding the case, ultimately, to the Planning Board, and given the fact that the issue was not litigated within the Planning Board, we find it unnecessary, and inappropriate under the circumstances, to definitively resolve how the General Plan should apply under the Subdivision Regulations. Pursuant to our remand, the parties will have an opportunity to revisit this issue in light of the above comments.

### Planning Board's second resolution

The Planning Board added the following statements to its earlier decision.

Section 24–121(a)(5) of the Subdivision Regulations states: "The plat shall conform to the area master plan, including maps and text, unless the Planning Board finds that events have occurred to render the relevant plan recommendations no longer appropriate or the District Council has not imposed the recommended zoning."

Several elements of the plan, as approved with conditions and as noted in various review referrals, demonstrate conformance to the maps and text of the [M]aster [P]lan and [G]eneral [P]lan. No rare, threatened or endangered species of plants or animals will be impacted by the development. No designated scenic or historic roads will be impacted by the development. Of the approximate 124 acres of woodland conservation required, all will be in the form of existing preservation on site. All of the site's environmentally sensitive area of Patuxent River Primary Management Area (PMA) is conditioned to remain undisturbed. A building restriction line four times that required by the O–S Zone is conditioned upon this property's relatively narrow road frontage along Bald Eagle School Road for the purpose of retaining the rural character of the view shed. An additional condition was established for a future Detailed Site Plan (DSP) with review elements to include the design of any entrance feature and the type and extent of streetlights to be considered so that it may help to maintain the rural character. Conservation easements are required over the environmental features to additionally provide for the retention of a quasi-public open space system. The lotting pattern established provides for the implementation of high-end estate housing. The transportation system was found to meet the minimum level of service (LOS) criteria established for the Rural Tier. The private sector builder will be required to fund a portion of the needed infrastructure in the form of fire and rescue facilities. The private sector builder will be required to contribute towards the implementation of a Class III bikeway. The lot sizes conform to the minimum standards established for the O–S Zone. The overall project density is consistent with the O–S Zone and the land use recommendation. The ultimate development of the 47 lots created by this subdivision are not in conflict with the hundreds of dwelling units envisioned in the Rural Tier over the next approximate 20 years, given one percent of the County's residential growth in that time frame.

The 2002 General Plan established seven goals for the Rural Tier. While it is acknowledged that this specific property, with this specific development proposal, will not retain sustainable agricultural land, nor will it limit non-agricultural uses, it will preserve environmentally sensitive features; it will help to maintain rural character; it will allow for large lot estate residences; it will protect the land owners' equity in their land; and it will maintain the integrity of the rural transportation system.

### Circuit court opinion

As further discussed below in the Standard of Review section, we review the action of the administrative agency. We perform essentially the same function as that performed by the circuit court. Nevertheless, we shall summarize the circuit court's opinion because it is necessary to understand the parties' contentions.

The circuit court concluded that, pursuant to County Code § 24–121(a)(5), the Master Plan is binding with respect to subdivision development and, relying on §§ 24–103(a)[5] and 24–104(a)(2),[6] the Master Plan incorporated the General Plan to the extent that the Master Plan does not reject or amend the General Plan.

The court observed that both the Master Plan and General Plan contemplated future development in the area in question and, thus, did not prohibit it. Nevertheless, the court concluded that the Planning Board's findings, in its second resolution, were insufficient. The court explained:

---

**5.** "It is hereby declared to be the policy of Prince George's County to consider the subdivision of land and the subsequent development of the subdivided land as subject to the control of the County, pursuant to the General Plan, for the orderly, planned, efficient, and economical development of the County."

**6.** "The purposes of this Subtitle are as follows: ... to guide development according to the General Plan, area master plans, and their amendments."

Specifically, the Planning Board's Amended Resolution does not contain information relating specifically to projected housing unit growth in Prince George's County between 2000 and 2025. The Amended Resolution does not contemplate with specificity how many dwelling units have already been approved in the Rural Tier since 2000, when the County Council adopted the Biennial Growth Policy Plan. Finally, the Planning Board erroneously assumes a 1% growth in the number of dwelling units within the Rural Tier over the next 20 years, rather than considering efforts to slow growth to 0.75%.

The last statement was based on the court's conclusion that the General Plan incorporated the objectives of the Biennial Plan, which contained a growth objective of 0.75%.

The court ordered the Planning Board to:

make findings on the number of new dwelling units constructed and projected to be constructed between 2000 and 2025 in the whole of Prince George's County; the number of dwelling units already approved for construction in the Rural Tier of Prince George's County; and whether the addition of 46 new dwelling units in the rural Tier will cause growth in the Rural Tier since 2000 to exceed 0.75–1.00% of overall projected dwelling unit growth.

As we read the circuit court opinion, the court did not conclude that the evidence was legally insufficient.

## Contentions

With that background, we shall describe the contentions of the parties. First, both appellants, the developer and the Planning Board, contend that the Planning Board did not err in concluding that the preliminary subdivision plan conformed[7] to the Master Plan and the General Plan, to the

---

7. The Planning Board used the terms "consistent with" and "conforms to" synonymously, when discussing whether the preliminary subdivision plan complied with the Master and General Plans. For a discussion of the use of those terms in the land planning and zoning context, see *Trail v. Terrapin Run, LLC,* 174 Md.App. 43, 920 A.2d 597 (2007).

extent applicable. According to appellants, a proposed subdivision does not have to comply with all requirements in either Plan. Second, they assert that the Master Plan referred only to the 1982 General Plan and did not amend the 2002 General Plan, which was not in existence at the time of adoption of the Master Plan. Similarly, they assert that the General Plan superseded the Biennial Plan. Third, appellants question whether the General Plan is binding but, even if it is, assert that the growth objectives are not applicable because they had to be implemented, and the District Council did not legislatively implement the policies until 2006, when it adopted regulations to protect the planning process in the O–S Zone. Appellants rely on the exceptions contained in § 24–121(a)(5), which provides that a subdivision plan "shall conform to the area master plan . . . *unless* the Planning Board finds that events have occurred to render the relevant plan recommendations no longer appropriate or the District Council has not imposed the recommended zoning." (emphasis added). Finally, they assert that the Planning Board's findings are sufficient and supported by substantial evidence.

Appellees contend that: (1) this Court, in its earlier opinion, held that the Master Plan and portions of the General Plan incorporated into the Master Plan are a binding prerequisite to development, and appellants are bound by that decision; (2) there is no substantial evidence that the developer complied with the General Plan's numeric restriction on residential growth in the Rural Tier; (3) the question whether events have occurred that would permit the Planning Board to waive the numeric restriction *(see* 24–121(a)(5)) is not before us because the developer did not seek a waiver, and the Planning Board did not address the issue; (4) waiver would not be appropriate in any event because of the lack of evidence that events have occurred that would permit waiver; (5)the Planning Board has no right to appeal an adverse order; and (6) in the alternative, the Planning Board erred in approving the preliminary subdivision plan despite the fact that the plan did not comply with all provisions in the Master Plan and General Plan. With respect to the last contention, appellees argue that

the Master Plan incorporated the General Plan to the extent that it did not amend it, both are binding, and the General Plan incorporated the objectives of the Biennial Plan.

## Standard of Review

As we recently stated in *Becker v. Anne Arundel County*, 174 Md.App. 114, 920 A.2d 1118 (2007):

Administrative agency decisions are not set aside unless the decision is arbitrary, illegal or capricious. *Mortimer v. Howard Research & Dev. Corp.*, 83 Md.App. 432, 441, 575 A.2d 750 (1990). In determining whether a decision is arbitrary, illegal or capricious, a reviewing court must decide whether the question before the agency was fairly debatable. *Id.* An issue is fairly debatable if reasonable minds could have reached a different conclusion on the evidence, and if the conclusion is supported by substantial evidence in the record. *Stansbury v. Jones*, 372 Md. 172, 182–83, 812 A.2d 312 (2002); *see Howard County v. Dorsey*, 45 Md.App. 692, 701, 416 A.2d 23 (1980) ("The 'fairly debatable' test is analogous to the 'clearly erroneous' standard commonly applied under [Rule 8–131(c)]. A court must consider all of the evidence before the zoning authority; the decision is 'fairly debatable' if it is supported by substantial evidence on the record taken as a whole.") (other citations omitted); *Bd. of County Comm'rs for Cecil County v. Holbrook*, 314 Md. 210, 218, 550 A.2d 664 (1988) (stating that if the issue is fairly debatable, the matter is one for the Board's judgment and should not be second-guessed by an appellate court.). "In regards to findings of fact, the court cannot substitute its judgment for that of the agency and must accept the agency's conclusions if they are based on substantial evidence and if reasoning minds could reach the same conclusion based on the record; when reviewing findings of law, however, no such deference is given the agency's conclusions." *Layton v. Howard County Bd. of Appeals*, 171 Md.App. 137, 173–74, 908 A.2d 724 (2006) (*quoting Hayfields, Inc. v. Valleys Planning Council, Inc.*, 122 Md.App. 616, 629, 716 A.2d 311 (1998) (other

citations omitted)). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Snowden v. City of Baltimore*, 224 Md. 443, 448, 168 A.2d 390 (1961). The "resolution of conflicts in the evidence is left to the agency and, where inconsistent inferences may be drawn, the agency is left to draw the inference." *Layton*, 171 Md.App. at 174, 908 A.2d 724 (*citing Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 513, 390 A.2d 1119 (1978)). The test for reviewing the inferences drawn is reasonableness, not rightness. *Snowden*, 224 Md. at 448, 168 A.2d 390.

On the other hand, a reviewing court may not uphold an agency's decision if a record of the facts on which the agency acted or a statement of reasons for its action is lacking. *Mortimer*, 83 Md.App. at 441, 575 A.2d 750 (*citing Board of County Comm'rs for Prince George's County v. Ziegler*, 244 Md. 224, 229, 223 A.2d 255 (1966)). Without this reasoned analysis, a reviewing court cannot determine the basis of the agency's action. *Mortimer*, 83 Md.App. at 441, 575 A.2d 750. If the agency fails to meet this requirement, the agency's decision may be deemed arbitrary. *Id.* (citation omitted). "Findings of fact must be meaningful and cannot simply repeat statutory criteria, broad conclusory statements, or boilerplate resolutions." *Bucktail, LLC v. County Council of Talbot County*, 352 Md. 530, 553, 723 A.2d 440 (1999).

*Becker*, 174 Md.App. 114, 137–139, 920 A.2d 1118.

### Discussion

#### *Planning Board's right to appeal*

Appellees contend the Planning Board had no right to appeal from a decision that was adverse to it. Appellees argue that the Planning Board is a State agency, and thus, its right to appeal is governed by the contested case portion of the Administrative Procedure Act, Maryland Code (2004 Repl. Vol.), §§ 10–201 through 10–226 and, specifically, § 10–

222(a)(2) of the State Government Article ("S.G."). Section 10–222(a)(2) provides that "[a]n agency, including an agency that has delegated a contested case to the Office [of Administrative Hearings], is entitled to judicial review of a decision as provided in this section if the agency was a party before the agency or the Office." Appellees argue that the Planning Board was not a party in the administrative proceeding, but rather was the administrative body performing a quasi-judicial function and, thus, did not fit within § 10–222(a)(2).

The Planning Board contends it had a right to appeal. It argues that it is a "regional entity" and not a State agency within the meaning of the Administrative Procedure Act. It further argues that the question of appeal is controlled by Maryland Code (2003 Repl.Vol.), Article 28, § 7–116(g). In pertinent part, that subsection provides:

A final action by the Commission on any application for the subdivision of land within 30 days after the action is taken by the Commission, may be appealed by any person aggrieved by the action, or by any person, municipality, corporation, or association, whether or not incorporated, which has appeared at the hearing in person, by attorney or in writing to the circuit court for the county which may affirm or reverse the action appealed from, or remand it to the Commission for further consideration. . . .

■ We conclude that the Planning Board is a State agency within the meaning of the Administrative Procedure Act, and that it had a right to appeal to this Court. The Commission, of which the Planning Board is a part, was created by the General Assembly. See *Prince George's County v. Maryland–National Capital Park and Planning Commission,* 269 Md. 202, 206–207, 306 A.2d 223 (1973). The Commission comes within the definition of agency in S.G. § 10–202(b).

Agency means

(1) an officer or unit of the State government authorized by law to adjudicate contested cases; or

(2) a unit that:

(i) is created by general law:

(ii) operates in at least 2 counties; and

(iii) is authorized by law to adjudicate contested cases.

The Commission fits within subsection (2).

Subsection 10–202(d) provides, in part, that a "contested case" is a proceeding before an agency to determine "a right, duty, statutory entitlement, or privilege of a person that is required by statute or constitution to be determined only after an opportunity for an agency hearing." A hearing was held pursuant to Prince George's County Code § 24–119. The matter before the Planning Board was a "contested case."

In *Maryland–National Capital Park and Planning Commission v. Anderson,* 395 Md. 172, 909 A.2d 694 (2006), the Court of Appeals stated that the Commission is a State agency under § 10–202(b) with respect to contested cases. 395 Md. at 177, n. 1, 909 A.2d 694. The Court also recognized that the Administrative Procedure Act provides agencies with the right to seek judicial review of their decisions. *Id.* at 192, n. 16, 909 A.2d 694.

The *Anderson* case involved the Commission's effort to obtain judicial review of a decision by a hearing board under the Law Enforcement Officer's Bill of Rights (LEOBR), Maryland Code (2003), § 3–101 et seq. of the Public Safety Article, when the board was comprised of officers from the Commission's Prince George's County Park Police Department. The situation before us is analogous.

The two cases relied on by the Commission for the proposition that the Commission is not a State agency within the meaning of the Administrative Procedure Act are not on point. In *Prince George's County v. Maryland–National Capital Park and Planning Commission, supra,* the County and the Commission sought a declaratory judgment to resolve a dispute between them as to their respective functions. In the other case, *Ram Ditta v. Maryland–National Capital Park and Planning Commission,* 822 F.2d 456 (4th cir.1987), the issue was whether the Commission was an alter ego of the State for purposes of Eleventh Amendment immunity from tort suits, a federal question. The court concluded that it was

not, while acknowledging that the Court of Appeals had held that the Commission was a State agency and immune from tort suits under the doctrine of State sovereign immunity. *See O & B, Inc. v. Maryland–National Park and Planning Commission,* 279 Md. 459, 369 A.2d 553 (1977).

Section 10–222 of the State Government Article addresses the right to seek judicial review of an administrative decision in the appropriate circuit court. The question in *Anderson* was whether the Commission had the right to seek judicial review in circuit court. In the case before us, the Planning Board did not seek judicial review in circuit court. Appellees did. The Planning Board was a party in circuit court. Thus, the Planning Board's right of appeal to this Court is governed by S.G. § 10–223(b), which provides:

(b) *Right of appeal*—(1) A party who is aggrieved by a final judgment of a circuit court under this subtitle may appeal to the Court of Special Appeals in the manner that law provides for appeal of civil cases.

(2) An agency that was a party in the circuit court may appeal under paragraph (1) of this subsection.

Pursuant to that section, the Planning Board had a right to appeal to this Court.

The Planning Board relies on Article 28, § 7–116(g), but that section does not address the situation before us. It applies to judicial review of an administrative decision in circuit court. It may be that the Planning Board had a right to appeal to this Court as part of its general powers, granted by Article 28, § 2–110. That section provides that the Commission has the power to sue and be sued and to do all other corporate acts for the purpose of carrying out the provisions of Article 28. We need not decide that question, however, in light of our earlier conclusion.[8]

---

8. Section 12–301 of the Courts and Judicial Proceedings Article provides a general right of appeal from a final judgment in circuit court. That right is subject to § 12–302, however, which, in subsection (a), does not permit an appeal from a circuit court's review of an adminis-

*Role of the Master Plan and General Plan*

■ This case, as have several before it, involves the interplay between planning, zoning, and the subdivision process. The terms planning and zoning are sometimes used interchangeably, but they are not synonymous. Zoning is, whereas planning is a much broader term. *Coffey v. Maryland–Nat'l Capital Park and Planning Comm'n,* 293 Md. 24, 27, 441 A.2d 1041 (1982). Zoning is one means by which planning is implemented. The latter, as is clear from a review of the planning documents involved in this case, encompasses education, public facilities, transportation, environmental protection, and other matters affecting the economic, social, and environmental vitality of the jurisdiction involved. Planning, zoning, and subdivision regulation are all part of land planning and use. *Id.*

Before discussing the role of the Master Plan and General Plan in the subdivision process, we will discuss the relationship between the Biennial Plan, Master Plan, and General Plan.

The Biennial Plan established "goals, priorities and policies," utilizing "a system of growth tiers, corridors and centers to guide future land use and development." The District Council characterized it as an interim plan and recognized that various regulations would have to be revised to fully implement the Biennial Plan. The Biennial Plan recognized that a new general plan would have to be developed and that area master plans would have to be updated.

The General Plan was approved in 2002. The Plan's introduction states that it is to "provide guidance for the future growth and development" of the County, "expressed as goals, objectives, policies, and strategies that, taken together, determine the preferred development pattern and the transportation system, public facilities and environmental features needed to accommodate that pattern." The Plan states that it

---

trative decision. *See Kant v. Montgomery County,* 365 Md. 269, 274–275, 778 A.2d 384 (2001).

embraces and, in some instances, modifies and supersedes the Biennial Plan. In its resolution approving the General Plan, the District Council stated that the General Plan would guide future development, implementation, and achievement of plan policies, would supersede the 1982 General Plan, and would "amend current master plans and functional plans with respect to countywide goals, objectives, policies, and strategies . . . . "

By virtue of the General Plan's express language, it superseded the Biennial Plan, to the extent inconsistent with the Biennial Plan. The Biennial Plan was intended to be an interim plan. We conclude that the numeric growth objective in the General Plan, as to the Rural Tier, superseded the numeric objective in the Biennial Plan.

To our knowledge, since 2002, a master plan has not been approved for the area in which the subject property is located. Consequently, the 1993 Master Plan remains in effect, except to the extent inconsistent with the General Plan, i.e., to the extent inconsistent with the "goals, objectives, policies and strategies" contained in the General Plan.

Both the Court of Appeals and this Court have considered the role of general planning documents on several occasions. A plan may serve as a mere guide or it may have greater effect. In most cases, planning documents have been referred to as general guides and recommendations advisory and not regulatory, in nature. *See, e.g., Duke Street Ltd. P'ship v. Bd. of County Comm'rs of Calvert County*, 112 Md.App. 37, 53, 684 A.2d 40 (1996).

 One has to look at the facts of each case, however. In the context of the relationship between a plan and a special exception use, the question, ordinarily, is whether the use "is in harmony with the general purpose and intent of the plan." *Schultz v. Pritts*, 291 Md. 1, 11, 432 A.2d 1319 (1981).

In *Duke Street*, the question was whether a street shown on a plan could serve as the basis for justifiable reliance by a developer that the street would be approved and constructed. We answered that in the negative.

In *Coscan Washington, Inc. v. Maryland–Nat'l Capital Park and Planning Comm'n*, 87 Md.App. 602, 590 A.2d 1080 (1991), this Court observed that the Prince George's County 1982 General Plan was not a mandate but that its guidelines and policies could support the Planning Board's refusal to approve a plan. *Id.* at 616–17, 590 A.2d 1080. The point is that an agency could, by implementing guidelines and policies, refuse certain requests, but if the plan were not mandatory, even if inconsistent with the request, the plan would not mandate that refusal.

■ In *People's Counsel v. Beachwood*, 107 Md.App. 627, 670 A.2d 484 (1995), we reviewed why, in the adoption of a comprehensive zoning map, a general plan serves only as a guide, in the absence of an ordinance or regulation to the contrary. Comprehensive zoning or rezoning is a legislative function, and there is no requirement that it conform to the recommendations in a plan. *Id.*

On the other hand, the Court of Appeals has found statutory language giving plans greater effect, in the context of regulating subdivision development. The Court of Appeals has held that a plan had binding effect and could serve as a basis for a planning board to refuse to approve a proposed subdivision when it was not compatible with the plan. *See Coffey*, 293 Md. at 30–31, 441 A.2d 1041(arising out of Prince George's County—a charter county); *Bd. of County Comm'rs v. Gaster*, 285 Md. 233, 401 A.2d 666 (1979) (arising out of Cecil County – a non-charter county).

■ In *Richmarr Holly Hills, Inc. v. American PCS, L.P.*, 117 Md.App. 607, 636, 701 A.2d 879 (1997), after reviewing reported cases, we concluded that, with one exception,[9] the weight to be given a plan depends upon the language used in the applicable ordinance and the nature and purpose of land use and general planning. Ultimately, as observed in *Rich-*

---

9. With respect to piecemeal petitions for rezoning, a general plan may never be more than a guide. *Richmarr*, 117 Md.App. at 636, 701 A.2d 879.

*marr* and again in *Trail v. Terrapin Run, LLC, supra,* in a given situation, the two questions are whether the body adopting the plan had authority to do so and if so, whether the plan was enacted as a guide or a strict regulatory device.

In this case, there is no question but that the District Council has planning and zoning authority. *See* Maryland Code (1957, 2005 Repl.Vol.), Art. 28, §§ 7–108 and 7–108.1. The District Council also has authority to adopt subdivision regulations. *See id.* §§ 7–115, 7–116, and 7–117.

The question then is whether the Master Plan and General Plan were adopted as guides or as strict regulatory devices. In § 24–121(a)(5) of the subdivision regulations, the District Council provided that, with exceptions discussed below, a preliminary subdivision plan "shall conform to the area master plan." In Prince George's County, an area master plan is conceptually distinct from a general plan. There is no similar legislative enactment requiring conformance to a general plan. The fact that the conformance requirement applies only to master plans is understandable, however, because they are more detailed, relate to specific areas, and are one of the methods of implementing a general plan.

In *Coffey,* the Court of Appeals held that the Prince George's County master plan involved in that case was a binding document. At that time, the County Code, § 24–103(a)(1) provided that "[t]he plat shall conform to the Master Plan." In 1981, the District Council adopted new subdivision regulations. Two exceptions to the requirement of Master Plan conformity, as they now appear in § 24–121(a)(5), were added in 1981, effective January 1, 1982. The two exceptions are (1) if the Planning Board finds events have occurred that make the relevant plan recommendation inappropriate, or (2) the District Council has not imposed the recommended Zoning.

Based on the above, the Planning Board contends that *Coffey* is not controlling and the current language gives the Board discretion in how it implements the Plans. We need not address that issue because the Planning Board did not find

that events had occurred to make the Plan provisions inappropriate. Because it was not the basis for the Board's decision, it cannot be the basis for this Court's decision.

█ Based on the *Coffey* decision and the "conform to" language in the current County Code, subject to the two exceptions, we conclude that the Master Plan is a binding document. The Master Plan does not expressly contain a numeric growth objective.

█ We find nothing in the legislative framework that treats the General Plan as a binding, regulatory document. In our view, §§ 24–103(a) and 24–104(a)(2), quoted in footnotes 4 and 5, do not accomplish that, but rather refer to it as a guide. The Master Plan must be in accordance with the General Plan, however. That means it must be consistent and compatible, and to the extent it is not, the General Plan prevails. The Master Plan, however, is binding and it was partially expressly amended by the General Plan, to the extent that the General Plan's Countywide goals, objectives, policies and strategies, including growth objectives, were made a part of the Master Plan.

Concluding that the Master Plan is binding does not fully answer the questions. What does binding mean? All of the planning documents discussed above expressly recognize the obvious, that good planning is an ongoing process, subject to evaluation and change as circumstances change, and subject to the availability of resources to permit evaluation, change, and implementation. All of the plans recognize a need for implementation, including in some instances changes in zoning text and maps and changes in regulations applicable to the development process. The nature of planning and the nature and extent of any necessary implementation have to be taken into account when evaluating the role that a planning document plays in a specific context, even if binding.

Plans may range from very general to very specific. A general plan may contain specific elements, and a specific plan may contain general elements. General plans are frequently used as aspirational guidelines because of their general nature,

and they are implemented, or not, as the decision making bodies, through legislative or administrative actions, implement the guidelines. In the case of a mandatory plan, its specific elements may be clearly and easily applied, but its more general elements may be unclear, and even conflicting, when applied in a specific instance.

The General Plan and the Master Plan contain many general goals and objectives, not necessarily consistent when applied to a specific property. Thus, at times, various provisions in the Plans have to be interpreted and applied, in light of other provisions, the goals, and limitations contained in the Plans. With respect to the Plans, the Planning Board performs that function and is entitled to deference in that regard.

The countywide goals, objectives, policies, and strategies that are part of the Master Plan are general in nature and, absent implementation by specific regulatory requirements, cannot be literally complied with as to each property and each issue relating to development. The interpretation, balancing of factors, and application of the Master Plan and General Plan rested with the Planning Board, operating within the context of zoning and other regulatory requirements.

The numeric growth "objective" is, in the words of the General Plan, "a specific, measurable activity or target to be accomplished in pursuing a 'desirable future condition.'" It necessarily requires periodic evaluation to determine if it is attainable. Attainment of goals is dependent on many factors, including the nature, extent, and effectiveness of implementing regulations, and to some extent, the decision making of bodies such as the Planning Board. The function of interpreting and applying the Plans rested with the Planning Board, and subject to the substantial evidence test, it had discretion to determine whether the preliminary subdivision plan conformed to the Master Plan and to the goals, objectives, policies, and strategies in the General Plan.

Appellants argue that the Planning Board's decision should be affirmed because the District Council has not implemented the Plans with zoning requirements, one of the exceptions in

County Code, § 24–121(a)(5). Specifically, the Planning Board points out that the District Council did not enact legislation implementing the General Plan's growth objective in the Rural Tier until it imposed a moratorium on subdivision development in 2005 and changed zoning regulations in 2006.[10]

To the extent necessary to decide the issues before us, the question of implementation was addressed in our discussion above.[11] As we have discussed, the nature and extent of plan implementation may be enhanced by regulatory changes. Nevertheless, the Plans were effective when adopted, as described above.

▪ Before leaving the issue of the role of the Plans, we will comment briefly on appellees' argument that, on the first appeal, we held that the General Plan is a binding regulatory document, and that ruling stands as the law of the case. We find it unnecessary to discuss the parameters of the law of the case doctrine because appellees' premise is incorrect.[12] As quoted above, we stated that the General Plan had some effect but deemed it inappropriate to definitively determine what effect, expressly stating that the parties could visit the question on remand.

---

**10.** The changes are not applicable to the preliminary subdivision plan at issue in this case, as expressly stated in the ordinances, because the subdivision plan was filed before the effective date of the changes.

**11.** The facts in *Richmarr,* 117 Md.App. 607, 701 A.2d 879, are an example of when a proposed use would be clearly inconsistent with the plan and when the express exception would be clearly applicable. In *Richmarr,* the applicant applied for a special exception to build a wireless communications tower, permitted by the zoning classification. The plan recommended that the area in which the property was located be rezoned to office research industrial use, which would not have permitted a tower. The conclusion on the facts in that case was that the county ordinance did not require compliance with the plan, and the local board could exercise discretion.

**12.** The law of the case doctrine is a flexible rule of appellate procedure and is not synonymous with claim and issue preclusion. *See Goldstein and Baron Chartered v. Chesley,* 375 Md. 244, 254, 259–260, 825 A.2d 985 (2003).

■■■■■■■■■■

*Substantial evidence and findings*

■ As mentioned above, the Planning Board, in its first resolution, stated that the developer's preliminary subdivision plan was consistent with the Master Plan and the General Plan. This Court concluded that the statement was not specific enough to permit meaningful judicial review and remanded the case to the Planning Board.

On remand, the Planning Board held a hearing on June 23, 2005. In its amended resolution, the Planning Board added statements to its earlier resolution. Those statements are quoted on pages 9–11 of this opinion.

Appellees contend there is legally insufficient evidence to support the conclusion that the preliminary plan conformed to the General Plan's numeric restriction on residential growth. Appellees did not raise this issue on the first appeal to this Court.[13]

On remand, at the hearing before the Planning Board, Alan Hirsch presented the staff's recommendation that the Board approve the preliminary subdivision plan. Mr. Hirsch stated that the subdivision plan, as originally approved, with nine conditions, conformed to the General Plan and Master Plan.

In pertinent part, Mr. Hirsch stated:

---

**13.** The issues presented by appellees (appellants then) were

"1. Did the Board's two sentences to the effect that the Developer's Preliminary Plan complied with the two applicable master plans articulate findings of fact and conclusions of law sufficient for this Court to review?

2. Could reasoning minds have reached the conclusion that fire-fighting facilities were available, adequate, and sufficient when the evidence was that fire trucks responding to a fire in the subdivision would have neither enough water nor enough hose with which to fight the fire?

3. Could the Board properly premise its action on facts which the Board itself found to be inaccurate and incomplete without conditions requiring that subsequently submitted data be subject to review and approval by it or another agency?

4. Did Article 28 § 7–117 limit the Board's power of either approving the revised application with conditions on February 20 or else allowing automatic approval without conditions, which the Developer's revisions had delayed the hearing date?"

Staff would like to begin with the understanding that a Master Plan is a regional document, in the case of Subregion 6, approximately 124 square miles, and that not all recommendations of a plan can be applicable or be accommodated on each property in the study area. Likewise, the General Plan, which covers the entire County, is a document intended to provide guidance in a regional context.

Mr. Hirsch then reviewed the goals and objectives of the Master Plan and General Plan, noting that the Plans recognized there would be future legislative actions "intended to balance the ever-increasing pressure for residential development and land owners' equity with a desire to maintain rural environment," including "revision to tax regulations, consider creating a County program to purchase development rights, investigate options for establishing a transfer of development rights, develop programs to sustain agriculture as a viable industry, reinforce programs that promote agricultural industries, [and] utilize agricultural preservation and advisory boards."

Mr. Hirsch continued:

With regard to specific facts and supporting the contention of conformance to the Master Plan and General Plan, Staff offers the following: As part of the plan that was approved by this Board, no rare, threatened or endangered species of plants or animals will be impacted by this development.

* * *

Of the approximate 124 acres of woodland conservation required, all will be in the form of existing tree preservation on site. All of the site's environmentally sensitive area of Patuxent River Primary Management Area is conditioned to remain undisturbed. A building restriction line four times that required by the O–S zone is conditioned upon this large property's relatively narrow road frontage along Bald Eagle School Road for the purpose of retaining the rural character of the view shed.

An additional condition was established for a future detailed site plan with elements such as the design of any entrance feature and the type and extent of any streetlights to be considered. Again, for the purpose of helping to maintain the rural character. Conservation easements are required over the environmental features to additionally provide for the retention of a quasi-open space system. The lotting pattern established provides for the implementation of high-end estate housing. The transportation system was found to meet the minimum level of Service C criteria established for the rural tier.

The private sector builder will be required to fund a portion of the needed infrastructure in the form of fire and rescue facilities. The private sector builder will be required to contribute towards the implementation of a Class 3 bikeway. The lot sizes conform to the minimum standards established for the O–S zone. The overall project density is consistent the O–S zone and the land use recommendation. And the ultimate development of 47 lots created by this subdivision are not in conflict with the hundreds of dwelling units envisioned in the rural tier over the next approximate 25 years, given 1 percent of the County's residential growth in that timeframe.

I would like to conclude by stating the seven goals of the rural tier as listed in the 2002 General Plan. While it is acknowledged that specific properties with—while it is acknowledged that this specific property with a specific development proposal will not retain sustainable agricultural land or limit nonagricultural uses, it will preserve environmentally sensitive features, it will maintain rural character, it will allow large lot estate residences, it will protect land owners' equity in their land, and it will maintain the integrity of the rural transportation system.

Following Mr. Hirsch's presentation, appellees' counsel presented a legal argument and then cross-examined Mr. Hirsch. Counsel argued that the matter was subject to a moritorium on development in the Rural Tier, effective with respect to

matters filed after January 10, 2005. The Board ruled adversely to counsel's position, and that matter is not before us.

Appellees' counsel cross-examined Mr. Hirsch with respect to the role of the Plans in the subdivision process and with respect to each of the objectives contained in the Master Plan. Mr. Hirsch acknowledged that not all of the objectives were met with respect to the property in question. Counsel did not examine Mr. Hirsch with respect to conformance to the numeric growth limitation in the General Plan. Appellees presented no evidence.

A possible allusion to the growth limitation occurred in the following exchange between appellees' counsel and the Board chair.

[Appellees' Counsel]: So I say how do we reconcile these conflicting signals in a harmonious way?[referring to objectives in Master Plan] On the one hand, if you go to the General Plan, it says it allows I think large lot estate-type development. I don't quote verbatim.

Chair: Uh-huh.

[Appellees' Counsel]: That type of language. On the other hand, we have language that says preserve the rural character. We have language that says every time you add houses to the O–S zone, you further erode the rural character. That's the language. How do you reconcile that, how do you allow large lot development in the face of those provisions I just alluded to? And the answer is what was articulated in the *Coffey* case,[14] that came out of this Planning Board, which says what do you do if the zoning gives you the development, the density to do-.... to do what the developer wants to do and when it conflicts with the Master Plan. It's like dropping drops of water into a glass. There comes a point where there's too much. So one of the vast omissions in this record, I respectfully submit, which is the failure of the developer's proof, not

**14.** *Coffey v. Maryland–Nat'l Capital Park and Planning Commission, supra.*

Staff's, is they need to address the legal principle articulated in *Coffey*. Which is what other development, residential development is there nearby this. So we're going to talk about the cumulative impact of this development. In fact -

Chair: why is—that part of the remand? Is that-

[Appellees' Counsel]: No, no. No. no.

Chair: Okay.

[Appellees' Counsel]: My point is that's the failure of proof. But that's the kind of evidence that would allow an informed fact finder to look at the whole picture and say is this one drop of water too much in the cup. But you can't—which is the metaphor they used in *Coffey*.

Chair: I remember.

[Appellees' Counsel]: Right. But here there's no evidence about-from the developer about the nearby developments. But this, the cumulative impact, we assert, is what pushes this development over the hump, which says, and that's how you get around the language about the large lot development.

But our narrow point, which is what we were on a few moments ago, is that our-with your permission, I'd like to go through these. I'm almost done.

Chair: You can go through those. . . .

Appellees' argument before the Board, and appellees' argument in circuit court, on judicial review of the Board's amended resolution, was that the Board, in attempting to reconcile the various Plan objectives, had to consider other subdivisions, not just the one in question. Before the Board, the argument was in the context of attempting to persuade the Board as fact finder. In circuit court, the argument was in the context of attempting to persuade the court that the evidence of other subdivisions was insufficient to sustain the finding that the developer's proposed subdivision conformed to the Plans and, specifically, their objectives. In other words, appellees' arguments before the Board and before the circuit court were in the context of whether the Board appropriately considered

and balanced all objectives in the Plans. They were not specifically based on the 1% numeric growth limitation.

Under the above circumstances, we conclude that Alan Hirsch's testimony constituted substantial evidence, sufficient to support the Planning Board's decision that the developer's preliminary subdivision plan conformed to the Plans. Mr. Hirsch discussed the elements of both Plans as applied to the property in question. He conformed to both Plans, having considered all elements and balanced them when necessary. The Planning Board agreed, for the reasons stated in its resolution and amended resolution. The Planning Board is in the best position to determine whether the preliminary subdivision plan conformed to the County's Plans. We will not disturb that judgment.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY WITH INSTRUCTIONS TO AFFIRM THE DECISION BY THE PLANNING BOARD OF THE MARYLAND–NATIONAL CAPITAL PARK AND PLANNING COMMISSION. COSTS TO BE PAID BY APPELLEES.**

### ON MOTIONS FOR RECONSIDERATION

Subsequent to the filing of this opinion, appellees filed a "motion for *en banc* reconsideration," in which they present two contentions. First, appellees contend that this reported decision by a "panel" of this Court is inconsistent with the prior unreported decision in *Garner v. Prince George's County Planning Bd. of the Maryland-National Capital Park and Planning Comm'n*, No. 2715, Sept. Term 2003, 160 Md.App. 714, 718 (filed January 18, 2005), decided by "another panel" of this Court. Appellees assert that the two opinions are inconsistent with respect to whether compliance with the 1% growth objective in the General Plan is a prerequisite to development in the Rural Tier.

Second, appellees contend that, if compliance with the growth objective is a prerequisite, there is no substantial evidence to support approval of the preliminary subdivision

plan. In that connection, appellees argue that this Court erred in holding they had waived the issue as to the numeric growth limitation because they argued it in circuit court, and in any event, agencies are bound to follow the law.

Also subsequent to the filing of this opinion, the County Council of Prince George's County, Maryland, sitting as the District Council for the Maryland-Washington Regional District in Prince George's County (the District Council), a nonparty to this appeal, filed a motion seeking leave to file "a memorandum *amicus curiae.*" In its memorandum, the District Court supports appellees' motion and further argues that this Court, in its reported opinion, "eviscerated" the General Plan and declared it to be of no effect.

This Court granted the District Council's motion for leave to file its memorandum. In addition, this Court requested the developer and the Planning Board to respond to the contentions by appellees and the District Council.

### Discussion

The contentions by appellees and the District Council are totally devoid of merit. With respect to the request for *en banc* review, the two decisions in question are not inconsistent, and even if they were, that would not warrant *en banc* review. As discussed in this opinion, "[t]he Planning Board, in its first resolution, stated that the developer's application was consistent with the land use recommendations in the Master Plan and with guidelines for development in the Rural Tier, as stated in the General Plan." Slip opinion, page 8. When the case was in this Court for the first time, a panel, in an unreported opinion, concluded that the statement was not specific enough to permit meaningful judicial review and ordered a remand to the Planning Board for further proceedings. As pointed out above, slip opinion, page 9, the panel stated that the General Plan had some effect but, because the parties had not litigated the issue before the Planning Board, the parties could visit the question on remand.

There is no inconsistency between the unreported decision and this decision. The panel in the unreported decision did not purport to decide the question of the role of the General Plan and could not because it had not been decided by the Planning Board.

Aside from the alleged inconsistency, the request for *en banc* review reflects a fundamental misunderstanding of how this Court has operated since its inception. An opinion that is filed unreported is an opinion by those members of this Court who constituted the panel. A reported decision is a decision *by the Court*, not a panel, and is not reported unless approved by at least a majority of the members of the Court. Moreover, a reported decision constitutes binding precedent, and an unreported decision does not, except as to the parties involved.

The assertion by appellees that this opinion declares the numeric growth objective in the General Plan to be of no effect and the assertion by the District Council that this opinion eviscerates the General Plan requires little response other than the assertions are a gross distortion of this Court's opinion. The General Plan amended the Master Plan "with respect to countrywide goals, objectives, policies, and strategies." Opinion, page 300, 933 A.2d at 409. The Master Plan is binding, and because "objectives," including growth objectives, were made a part of the Master Plan, they are binding. Opinion, pages 314–15, 933 A.2d at 418. The application of specific provisions in a plan, even if binding, rests with Planning Board, and subject to the substantial evidence test, it determines whether a preliminary subdivision plan conforms to the Master Plan and the objectives in the General Plan. Opinion, page 316, 933 A.2d at 419–20.

Contrary to appellees' assertion that, in this opinion, this Court held that they had waived their argument with respect to the numeric growth objective, we have not, although we could do so. It is helpful to review what is before us on this appeal. The Planning Board and the developer noted an appeal from the circuit court's decision in which it remanded the matter to the Planning Board to make specific findings

relating to construction activity in the Rural Tier. The issue raised by appellants is whether the circuit court erred in doing so, or more accurately, because we review the Planning Board's decision, whether further findings are required.

 Appellees did not note a cross appeal.[1] Nevertheless, we addressed all of the contentions raised by all parties, including the existence of substantial evidence relating to the Planning Board's conclusion that there is compliance with the numeric growth objective. We did so, however, in the context of what is before us.

As noted above, appellees did not raise sufficiency of the evidence on the first appeal to this Court. The matter was remanded to the Planning Board for further findings. On remand before the Planning Board, appellees argued that it should find as a fact that the preliminary subdivision plan was not in compliance with the Plans, and specifically, in balancing the sometime conflicting General Plan objectives, that the Board had to consider other subdivisions. In circuit court, appellees argued that the evidence of other subdivisions was legally insufficient to sustain the Planning Board's conclusion that the preliminary subdivision plan conformed to the Plans. The 1% limitation was not singled out. In that context and in the context of our discussion of the general nature of the Plan objective, to "capture [less than 1%] of the county's dwelling unit growth by 2025," even though binding, we conclude that the testimony of Alan Hirsch is legally sufficient to support the Planning's Board conclusion.

---

1. Generally, a party in a proceeding in circuit court must file a timely notice of appeal to seek appellate review of the circuit court's judgment. When a party loses on an issue in circuit court but receives a favorable judgment on another ground, the party, as appellee, and without noting a cross appeal, may contend that the judgment be affirmed on the ground on which it lost at circuit court. See *Automobile Trade Ass'n of Maryland v. Harold Folk Enterprises, Inc.*, 301 Md. 642, 648-649, 484 A.2d 612 (1984). In the case before us, the circuit court's decision was remand for further findings. Appellee's argument on appeal, that the evidence is legally insufficient to sustain the Planning Board's conclusion with respect to the growth limitation, does not constitute a ground for affirmance. Thus, a cross appeal was necessary to raise that issue.

Finally, we note that much of what appellees and the District Council complain of, the language in the County Code and the Plans, lies within the power of the District Council, a legislative body with planning and zoning authority and power to adopt subdivision regulations. *See, e.g.*, Maryland Code, article 28, sections 7-108 and 7-115 through 7-117.[2]

**MOTIONS FOR RECONSIDERATION DENIED.**

---

**2.** The developer, in its opposition to the motions by appellees and the District Council, asserts that, after its approval of the preliminary site plan, the Planning Board approved a limited detailed site plan. The District Council, on April 24, 2006, adopted the Planning Board's decision and, with two conditions not here relevant, approved a limited detailed site plan for the subdivision in question.