27 A.3d 597

**Debra NAYLOR, et al.**

**v.**

**PRINCE GEORGE'S COUNTY PLANNING BOARD.**

**No. 2809, Sept. Term, 2008.**

Court of Special Appeals of Maryland.

Aug. 31, 2011.

310

G. Macy Nelson, Towson, MD, for appellant.

Megan B. Owings & M. Andree Green (L. Teri Spradlin–Dahn, Rifkin Livingston, Levitan & Silver LLC, on the brief), Annapolis, MD, for appellee.

Panel: EYLER, JAMES R., KEHOE, JAMES A. KENNEY (Retired, Specially Assigned), JJ.

JAMES A. KENNEY (Retired, Specially Assigned), J.

In its 2002 General Plan, the Maryland–National Capital Park and Planning Commission (the "Commission") set, as a "smart growth" initiative, an objective of limiting the percentage of dwelling unit growth in the Rural Tier of Prince George's County through the year 2025 to less than one percent. Md. Nat'l Capital Park & Planning Comm'n, *Prince George's County Approved General Plan* 27 (2002). We shall refer to this as the "1% growth objective." In 2009, the Court of Appeals resolved a long-simmering dispute when it held that the Prince George's County Planning Board of the Commission is obligated to consider the 1% growth objective when evaluating an application for a preliminary subdivision plan. *See Md.–Nat'l Capital Park & Planning Comm'n v. Greater Baden–Aquasco Citizens Ass'n,* 412 Md. 73, 106, 985 A.2d 1160 (2009) (hereafter *"Greater Baden"*).

This appeal, however, stems from proceedings that occurred before that question was settled. In 2004 and, after remand, again in 2006, the Planning Board approved a preliminary subdivision plan submitted by Archers Glen Partners, Inc. (the "Developer"), appellee, for construction of nineteen homes in a development to be known as Bennington Farms.[1] Located in the Rural Tier of Prince George's County, the parcel adjoins Developer's "sister" subdivision known as Archers Glen, the approval of which was litigated simultaneously and eventually

---

1. Although the subdivision is variously referred to in the record as Bennington Farm and Bennington Farms, we shall use the plural that Developer uses in its brief.

affirmed in *Archers Glen Partners, Inc. v. Garner,* 176 Md. App. 292, 933 A.2d 405 (2007), *aff'd on other grounds,* 405 Md. 43, 949 A.2d 639 (2008) (hereafter *"Archers Glen ").*

When the Planning Board adopted an amended resolution (the "Amended Resolution") approving a preliminary subdivision plan for Bennington Farms (the "Preliminary Plan"), appellants Debra Naylor, Esther O. Naylor, Ruth Naylor, Joyce Anderson, Charles and Janette Hoisington, Scott and Susan Morrill, Ross Williams, and the Greater Baden–Aquasco Citizens Association (collectively "Citizens") petitioned for judicial review in the Circuit Court for Prince George's County. Despite Citizens' complaint that the subdivision plan is inconsistent with the 1% growth objective, the circuit court affirmed the Amended Resolution approving the Preliminary Plan.

Citizens challenge that judgment, raising three issues for our review, which we have reordered and slightly rephrased as follows:

I. Does the Planning Board have standing to participate in this appeal?

II. Did the Planning Board adequately articulate factual findings regarding the 1% growth objective?

III. Is there substantial evidence in the administrative record to support the Planning Board's finding that the Preliminary Plan is not inconsistent with the 1% growth objective?

Because this appeal can be resolved without deciding whether the Planning Board has standing to defend its Amended Resolution, we decline to address that issue. As for the Planning Board's approval of the Preliminary Plan for Bennington Farms, we shall apply lessons from *Archers Glen* and *Greater Baden* to conclude that the Planning Board properly considered the 1% growth objective in finding that this plan is not inconsistent with that objective, and that there is substantial evidence in this administrative record to support that finding.

## FACTS AND LEGAL PROCEEDINGS

In 2002, the Commission adopted a General Plan stating that, beginning in 2000, "[t]he growth objective of the [General Plan] is that 33 percent of the county's residential growth over the next 25 years is to be located in the Developed Tier, 66 percent in the Developing Tier, and one percent in the Rural Tier." Md.-Nat'l Capital Park & Planning Comm'n, *Prince George's County Approved General Plan* 4 (2002). As noted, this appeal arises from Citizens' opposition to the proposed development of Bennington Farms on the ground that approval of the nineteen dwelling units in that proposed subdivision is inconsistent with this 1% growth objective.

The property at issue is a 95.5 acre parcel in the Rural Tier, located on the south side of Bald Eagle Road in Westwood, which is in Planning Area 87A of Subregion VI. The parcel is zoned Open–Space ("O–S"), which permits single family detached residences on five acre lots, subject to a density limit of .2 dwelling units per acre. Adjoining this parcel is Archers Glen, a separately approved subdivision of forty-seven homes by this same Developer.

On December 9, 2004, the Planning Board approved the Developer's initial preliminary subdivision plan for Bennington Farms. Subsequent proceedings before the Board and in the courts resulted in the Amended Resolution that is under review in this appeal. The pertinent events are summarized in the following time line.

September 2004 Developer submitted a Preliminary Plan seeking approval of the Bennington Farms subdivision.

December 9, 2004 The Planning Board's Planning staff presented to the Board a composite Staff Report recommending approval of the Preliminary Plan with specified conditions. The Community Planning Division of the Board's Planning Staff, after reviewing the plan for compliance with the GeneralPlan and the MasterPlan, concluded that "[t]his application is not inconsistent with guidelines for development in the Rural Tier as defined in the General Plan" and that, because

"[t]his application conforms to the Low Rural residential land use characteristics recommended in the master plan[,] [t]here are no master plan issues associated with this application." The Planning Board passed a resolution approving the plan, with the recommended conditions.

February 8, 2005 Citizens petitioned for judicial review of the Planning Board's action in the Circuit Court for Prince George's County.

December 22, 2005 After Developer agreed that further administrative findings were necessary, the circuit court remanded the Preliminary Plan to the Planning Board for additional factual findings consistent with this Court's opinion in an appeal relating to Archers Glen. *See Garner v. Prince George's County Planning Bd. of the Md. Nat'l Capital Park & Planning Comm'n,* No. 2715, Sept. Term (Md.App.) *(filed Jan. 18, 2005).*

July 13, 2006 The Planning Board again approved the subdivision plan, issuing the Amended Resolution.

August 16, 2006 Citizens petitioned for judicial review of the Amended Resolution.

March 9, 2007 The circuit court held oral argument on Citizens' judicial review petition.

July 6, 2007 This Court affirmed an amended resolution approving the preliminary subdivision plan for Archers Glen against a challenge by a neighbor, Betty Garner, the individual appellants in this appeal, and the Greater Baden–Aquasco Citizens Association.[2] *See Archers Glen, 176 Md.App. 292, 295, 296 n. 3 (2007).*

October 3, 2007 Further proceedings in the circuit court, on Citizens' petition for judicial review of the Amended Resolution approving the Bennington Farms Preliminary Plan, were stayed pending

---

**2.** Each of the appellants in this appeal was also an appellant in *Archers Glen. See Archers Glen,* 176 Md.App. 292, 296 n. 3, 297 n. 4, 933 A.2d 405 (2007), *aff'd on other grounds,* 405 Md. 43, 949 A.2d 639 (2008).

appeal of the Archers Glen subdivision plan to the Court of Appeals.

June 9, 2008 — The Court of Appeals affirmed, on limited grounds, the judgment affirming the amended resolution for Archers Glen. *See Archers Glen, 405 Md. 43 (2008).*

November 17, 2008 — The circuit court heard additional arguments on Citizens' petition for judicial review of the Amended Resolution approving Bennington Farms.

January 26, 2009 — The circuit court affirmed the Amended Resolution approving the Preliminary Plan for Bennington Farms.

February 23, 2009 — Citizens noted this appeal.

We shall add facts as they pertain to the issues raised by Citizens.

## DISCUSSION

### Law Governing Review of the Planning Board's Amended Resolution

This appeal challenges the circuit court's judgment affirming the Planning Board's Amended Resolution. We therefore perform the same task as the circuit court, which is to review the Board's decision to approve the Amended Resolution based on the administrative record that was presented to the Board. *See Greater Baden,* 412 Md. at 83–84, 985 A.2d 1160. "Our review . . . is a narrow and highly deferential inquiry." *Id.* at 83, 985 A.2d 1160. "We determine whether the Board's decision is premised upon an erroneous conclusion of law and whether there is substantial evidence in the administrative record taken as a whole to support the Board's findings and conclusions." *Id.* at 84, 985 A.2d 1160.

In undertaking this review, we are guided by two cases in which Citizens challenged the Planning Board's approval of other preliminary subdivision plans for different proposed developments in the Rural Tier of Prince George's County. Because these opinions explain in detail the intricate web of

statutes, codes, and regulations that govern preliminary subdivision plans in Prince George's County, an "Article 28 charter" county, we will not reiterate those principles. Instead, our focus will be on the analogous facts and legal issues because these provide the framework for our analysis. Nevertheless, we shall carefully review those opinions—both as to what they decide and what they do not—as essential background for this appeal.

## Archers Glen

The year after the Planning Board approved the Preliminary Plan for Bennington Farms, we issued our decision in *Archers Glen Partners, Inc. v. Garner*, 176 Md.App. 292, 933 A.2d 405 (2007), *aff'd on other grounds*, 405 Md. 43, 949 A.2d 639 (2008). In that case, Citizens, along with lead plaintiff Betty Garner, challenged the Planning Board's approval of the preliminary subdivision plan for Archers Glen, a development of forty-seven residences to be built by Developer on property bordered by the Bennington Farms parcel. In a prior appeal resulting in an unreported opinion, this Court had remanded to the Planning Board because it failed "to articulate its decision with adequate specificity" as to whether the plan was consistent with the land use provisions in the County's General Plan and Master Plan. *Id.* at 296, 933 A.2d 405.

The Planning Board thereafter held a new evidentiary hearing and adopted an amended resolution, again approving the preliminary subdivision plan. *Id.* at 301–02, 933 A.2d 405. Garner and Citizens petitioned for judicial review. *Id.* at 303, 933 A.2d 405. The circuit court concluded that the Planning Board's resolution was once again insufficient, because it did "not contain information relating specifically to projected housing unit growth in Prince George's County between 2000 and 2025." *Id.* at 303, 933 A.2d 405. In particular, the court criticized the amended resolution for its lack of "specificity" regarding "how many dwelling units have already been approved in the Rural Tier since 2000, when the County Council adopted the Biennial Growth Policy Plan." *Id.* at 303–04, 933

A.2d 405. The circuit court remanded to the Board with instructions to

> "make findings on the number of new dwelling units constructed and projected to be constructed between 2000 and 2025 in the whole of Prince George's County; the number of dwelling units already approved for construction in the Rural Tier of Prince George's County; and whether the addition of 46 new dwelling units in the [R]ural Tier will cause growth in the Rural Tier since 2000 to exceed 0.75%–1.00% of overall projected dwelling unit growth."

*Id.* at 304, 933 A.2d 405.

Developer and the Planning Board appealed to this Court, contending, *inter alia,* that (1) the General Plan, including the 1% growth objective, did not apply; but that, (2) even if it did, the Planning Board "did not err in concluding that the preliminary subdivision plan conformed to the Master Plan and the General Plan"; and that (3) the Planning Board's "findings [were] sufficient and supported by substantial evidence." *Id.* at 304–05, 933 A.2d 405.

In response, Citizens contended, *inter alia,* that (1) the requirements in the General Plan are binding because they were incorporated into the applicable Master Plan, (2) the Board "erred in approving the preliminary subdivision plan despite the fact that the plan did not comply with all provisions in the Master Plan and General Plan," *id.* at 305, 933 A.2d 405, and (3) "there was no substantial evidence that the developer complied with the General Plan's numeric restriction on residential growth in the Rural Tier[.]" *Id.* at 305, 933 A.2d 405. In addition, Citizens asserted that the Board "had no right to appeal from a decision that was adverse to it." *Id.* at 307, 933 A.2d 405.

This Court reached the following conclusions relevant to this appeal:

- "[T]he [Planning] Board is a State agency within the meaning of the Administrative Procedure Act, and ... it had the right to appeal to this Court." *Id.* at 308, 933 A.2d 405.

- "[T]he Master Plan is a binding document" that, although it "does not expressly contain a numeric growth objective," must nevertheless "be consistent and compatible" with the General Plan[,]" which does contain the 1% growth objective. *Id.* at 315, 933 A.2d 405. "[T]o the extent that it is not, the General Plan prevails." *Id.* Because "[t]he Master Plan . . . is binding and it was partially expressly amended by the General Plan, . . . the General Plan's Countywide goals, objectives, policies and strategies, including growth objectives, were made a part of the Master Plan." *Id.*

- Nevertheless, "[t]he General Plan and the Master Plan contain many general goals and objectives, not necessarily consistent when applied to a specific property." *Id.* at 316, 933 A.2d 405. For that reason, "at times, various provisions in the Plans have to be interpreted and applied, in light of other provisions, the goals, and limitations contained in the Plans." *Id.* That function is performed by the Board, who "is entitled to deference in that regard." *Id.*

- "The numeric growth 'objective' is, in the words of the General Plan, 'a specific, measurable activity or target to be accomplished in pursuing a 'desirable future condition.' '" *Id.* "It necessarily requires periodic evaluation to determine if it is attainable[,]" which will depend "on many factors, including the nature, extent, and effectiveness of implementing regulations, and to some extent, the decision making of bodies such as the Planning Board." *Id.*

- The task of "interpreting and applying the Plans rested with the Planning Board, and subject to the substantial evidence test, it had discretion to determine whether the preliminary subdivision plan conformed to the Master Plan and to the goals, objectives, polices, and strategies in the General Plan." *Id.*

- In the remanded proceedings before the Planning Board, Citizens' arguments focused on "whether the Board appro-

priately considered and balanced all objectives in the Plans," rather than focusing specifically "on the 1% numeric growth limitation." *Id.* at 322–23, 933 A.2d 405.

- Based on this record, the testimony by Alan Hirsch, presenting the Planning Staff's recommendation that the Planning Board approve the Archers Glen plan, "constituted substantial evidence, sufficient to support the Planning Board's decision that the developer's preliminary subdivision plan conformed to the Plans." *Id.* at 323, 933 A.2d 405. As we shall set forth in detail in Part II of this opinion, "Mr. Hirsch discussed the elements of both Plans as applied to the property in question," indicating that all those elements were considered by the staff and that the Archers Glen plan conformed to them. *Id.* The Planning Board agreed with that testimony, "for the reasons stated in its resolution and amended resolution[,]" *id.*, which we shall also examine *infra* in Part II.

- Because "[t]he Planning Board is in the best position to determine whether the preliminary subdivision plan conformed to the County's Plans[,]" we declined to "disturb that judgment," vacated the circuit court's judgment, and remanded with instructions to affirm the Planning Board's decision to approve the Archers Glen plan. *Id.*

Upon petition by Garner and Citizens, the Court of Appeals granted *certiorari* on two limited questions: (1) whether the Planning Board was entitled to "participate as a party in a judicial review of its decision approving a Preliminary Plan for a residential development[,]" and (2) whether "the law of the case doctrine" applied so that the Planning Board was bound by statements in our unreported opinion from the first appeal as to the binding effect of the General Plan in the subdivision review process. *See Garner v. Archers Glen Partners, Inc.,* 405 Md. 43, 53, 949 A.2d 639 (2008); *Garner v. Archers Glen,* 403 Md. 304, 941 A.2d 1104 (2008).

In its opinion, the Court of Appeals declined to address the standing issue because it was "not preserved" in the circuit court, in either the first or the second judicial review proceed-

ings pertaining to Archers Glen. *See Archers Glen,* 405 Md. at 53, 949 A.2d 639. Moreover, because it was undisputed that Developer had standing to appeal the circuit court judgment, the Court adhered to the "settled principle of Maryland law that, 'where there exists a party having standing to bring an action ... we shall not ordinarily inquire as to whether another party on the same side also has standing.' " *Id.* at 54, 949 A.2d 639(quoting *Sugarloaf Citizens' Ass'n v. Dep't of Env't,* 344 Md. 271, 297, 686 A.2d 605 (1996)).

With respect to the law of the case issue, the Court of Appeals held that this Court's unreported "discussion of the legal role of the recommendations of the General Plan in the subdivision approval process in Prince George's County," relied upon Citizens, was merely "self-described" dicta that "did not resolve finally the issue or preclude the parties from litigating the issue on remand." *Id.* at 56, 59, 949 A.2d 639. As such, it "could not have been law of the case, nor was it intended to be so[.]" *Id.* at 59, 949 A.2d 639.

At the conclusion of its opinion, the Court noted that, although the parties "devoted substantial portions of their brief to arguing whether the General Plan's Growth Objectives are binding on the Commission and applicants in the subdivision review process[,] ... [t]hat issue is not properly before us and we shall not address it." *Id.* at 60, 949 A.2d 639. A year and a half later, however, the question of what impact the 1% growth objective has on the subdivision review process was squarely presented in *Greater Baden,* a judicial review action stemming from Citizens' opposition to yet another subdivision application in the Rural Tier. We examine that case next.

### Greater Baden

In *Md.–Nat'l Capital Park & Planning Comm'n v. Greater Baden–Aquasco Citizens Ass'n,* 412 Md. 73, 985 A.2d 1160 (2009), a developer applied for a preliminary subdivision plan for twenty residences on a 118.30 acre parcel located in the Rural Tier in southern Prince George's County, bordering the Charles County line. *Id.* at 77, 985 A.2d 1160. Citizens opposed the application, presenting testimony to the Planning

Board that since adoption of the 1% growth objective in 2002, "the Rural Tier of the County captured more than 1 percent of the County's dwelling unit growth, causing the District Council to place a temporary moratorium on growth, which moratorium had expired prior to the time the [d]eveloper submitted the present application for preliminary subdivision plan approval." *Id.* at 77, 106, 985 A.2d 1160.

The Commission's Planning staff did not address the 1% growth objective. *Id.* at 106, 985 A.2d 1160. "In contrast to his testimony in *Archers Glen*, neither Mr. Hirsch nor his colleague mentioned the numeric residential growth objection in either the Technical Staff Report or in their testimony before the Planning Board, although Mr. Hirsch discussed generally the goals of the General Plan and stated that the Preliminary Plan was 'not inconsistent with the requirements, or at least the visions and goals established by the General Plan of 2002.' " *Id.* at 106, 985 A.2d 1160. Nor did Citizens "cross-examine Mr. Hirsch with regard to" that conclusion. *Id.*

The Planning Board approved the application, issuing a resolution that reiterated Hirsch's general statement "that the application was not inconsistent with the General Plan and repeated certain goals found in the General Plan to buttress its approval, but without addressing the residential growth objective." *Id.* Citizens petitioned for judicial review. *Id.*

The circuit court remanded to the Planning Board because its resolution "did not articulate findings of fact with regard to conformance with all relevant recommendations of the General Plan and applicable Area Master Plan and ... there was no substantial evidence in the record to support the Planning Board's conclusion that the [p]reliminary [p]lan conformed with the General and Master Plans." *Id.* at 77, 80, 985 A.2d 1160. The developer and the Planning Board appealed to this Court, arguing that there was substantial evidence in the administrative record to support the Board's approval of the preliminary plan. *Id.* at 81, 985 A.2d 1160.

In an unreported opinion, a panel of this Court applied *Archers Glen* in holding that the 1% growth objective in the General Plan is "binding" on the Planning Board, although the Board has " 'discretion . . . in its interpretation and application . . . to a preliminary subdivision plan.' " *Id.* at 81, 83, 985 A.2d 1160. The panel further concluded that " 'when the evidence in a given case generates a material issue as to compliance with that objective,' the Planning Board must address the General Plan's numeric growth objective viz-a-viz the preliminary plan application before it." *Id.* at 81–82, 985 A.2d 1160. It held that, because Citizens' testimony raised the issue and the Planning Board failed to adequately consider it in either its deliberations or its resolution, "there was not substantial evidence that the application conformed to the Master Plan and the General Plan." *Id.* at 81, 985 A.2d 1160.

In doing so, the panel observed that "the Planning Board's 'verbatim recitation' of the written Technical Staff Report and recommendations in the Board's resolution 'was the functional equivalent of stating "the Planning Board agrees with everything in the Staff Report" and concluding the matter at that point.' " *Id.* at 82, 985 A.2d 1160. Cautioning that " 'rote repetition of a Staff Report does not constitute meaningful fact finding where the Staff Report does not clearly articulate the requisite relationship between the facts and the law[,]' " it characterized that approach as "unacceptable." *Id.* Moreover, it concluded that, "[e]ven where the Planning Board 'engaged in independent fact finding during its discussion of "community planning" considerations,' " its factual findings were insufficient and did not permit appellate review of the 1% growth objective. *Id.* at 83, 985 A.2d 1160.

The Court of Appeals granted *certiorari* and affirmed, "but for reasons somewhat less expansive than articulated in [the unreported] opinion[.]" *Id.* at 77, 985 A.2d 1160. The Court "decline[d] to adopt" as a general proposition that the Planning Board cannot make its written findings of fact by referencing or incorporating the contents of a staff report. *Id.* at 82 n. 9, 985 A.2d 1160. Instead, it endorsed the approach articulated in *Colao v. County Council of Prince George's*

*County,* 109 Md.App. 431, 460–61, 675 A.2d 148 (1996), that staff reports and recommendations may be adopted in the Planning Board's resolution " 'so long as the adopted findings and conclusions with each of the reports are sufficiently articulated, clear, and specific.' " *Id.*

Applying that standard to the *Greater Baden* administrative record, the Court pointed out that "the Planning Board did not simply incorporate by reference the Technical Staff's Report." *Id.* Although it "included large portions of the report in the [r]esolution," the Board also made "additional findings of fact and conclusions." *Id.* For that reason, the Court held that "[t]he Board's adoption of a substantial portion of a Staff Report does not give rise, in and of its mere adoption, to an adverse inference that the Board abdicated its task to exercise independent judgment." *Id.*

Instead, the Court concluded that the problem with the Planning Board's resolution was "[t]he omission in the findings of a required consideration[.]" *Id.* After thoroughly reviewing the statutory scheme governing land use planning in Prince George's County, *id.* at 85–95, 985 A.2d 1160, the Court agreed with our conclusion in *Archers Glen* that "the numeric residential growth objective regarding the Rural Tier in the General Plan amended and was incorporated into the Master Plan." *Id.* at 106, 985 A.2d 1160. Even though the Planning Board's resolution approving that preliminary subdivision plan "stated that the application was 'not inconsistent' with the General Plan and repeated certain goals found in the General Plan to buttress its approval," it did not mention the 1% growth objective. *Id.* That deficiency, the Court explained, required remand:

> [B]efore the Planning Board approves a preliminary subdivision plan, it must conclude that the application conforms to the applicable Master Plan. In reaching that conclusion, the Planning Board must consider the numeric residential growth objective of the General Plan. The proposed subdivision represents additional potential residential dwelling units in the Rural Tier. The Planning Board understood the

implications of an identical situation in *Archers Glen*, but seems here to have forgotten this point....

The General Plan contains an objective, that, by 2025, the Rural Tier should contain less than 1 percent of the County's dwelling unit growth. Available statistics reflect that residential growth in the Rural Tier between 2002 and 2007 did not track the 1 percent objective, albeit with 18 years to go before declaration of ultimate success or failure in attaining the objective is ascertainable. **Although it is mandatory that the Planning Board consider the numeric residential growth objective, it has leeway in that regard, especially where the 2025 horizon selected in the growth objective remains relatively distant at the present time. Even assuming residential growth in the Rural Tier in the short term may be in excess of the long term objective, the Board is not compelled necessarily to deny all residential subdivision applications coming before it in the Rural Tier until the desired equilibrium is attained. The Planning Board, in determining whether a preliminary subdivision plan conforms to the Master Plan, either must offer some analysis of how the preliminary subdivision plan under consideration may impact the long-term growth objective established in the General Plan or explain why such an analysis or conclusion is not required, as provided in § 24–121(a)(5) of the County Code.**[3] What the Board cannot do, however, is ignore entirely a patently relevant element of the Plan.

We concede the Commission's point that approval of a preliminary subdivision plan is not tantamount to final approval of dwelling unit growth or that actual construction pursuant to an approved subdivision plan is inevitable. Subdivision approval, however, is a necessary and critical

---

**3.** This provision in the Prince George's County Code states in pertinent part that "a proposed subdivision 'plat shall conform to the area master plan, including maps and text, unless the Planning Board finds that events have occurred to render the relevant plan recommendations no longer appropriate[.]' " *Greater Baden,* 412 Md. at 102, 985 A.2d 1160 (quoting Prince George's County Code § 24–121(a)(5)).

step towards approval and construction of a residential subdivision. A final plan of subdivision, once approved and recorded, usually determines the maximum number and type of dwelling units that may be allowed to be erected on a subject property. Therefore, **it is necessary that the Planning Board at least account for how, if at all, the proposed subdivision might affect residential growth in the Rural Tier, even if some modest assumptions must be made, and more difficult decisions deferred to later in the development process** . . . .

We agree with the intermediate appellate court's statement in *Archers Glen* that the Planning Board, after balancing and considering all elements, "is in the best position to determine whether the preliminary subdivision plan conformed to the County's plans." Unlike what the Planning Board did in considering the numeric growth objective in its second hearing in *Archers Glen*, that Board here did not consider any bearing the Preliminary Plan might have on growth objective in the Rural Tier. Although we typically accord deference to the administrative body that interprets regularly the regulations applicable to the task before it, here the Planning Board did not even consider in its conformity analysis a relevant and applicable provision of the Master Plan/General Plan, as required by the County Subdivision Regulations. The Board's conclusion that the application was "not inconsistent with the 2002 General Plan Development Pattern policies for the Rural Tier" was a broad conclusory statement and not based on sufficient facts in the record before it. Such a half-baked conclusion is not entitled to deferential review.

*Id.* at 106–09, 985 A.2d 1160 (emphasis added and citations omitted).

Thus, the Court of Appeals affirmed the judgment remanding to the Planning Board

on the ground that the Planning Board should have considered the General Plan's numeric growth objective in the Rural Tier in determining whether the Preliminary Plan conformed to the Master Plan. Our holding in all other

respects is more narrow than that expressed in the opinion of our brethren on the intermediate appellate court. We do not subscribe to the view that the Planning Board did not engage otherwise in meaningful fact-finding because its Resolution approving the Preliminary Plan was a "rote repetition" of the Technical Staff Report. It is not unreasonable for the Planning Board to rely on a Staff Reports, as the Planning Board did in this case, if the Staff Report is thorough, well conceived, and contains adequate findings of fact.

We also do not reach the same conclusion as the Court of Special Appeals with regard to whether a material dispute was created on this record by opposition testimony regarding the proposed subdivision and the General Plan's numeric growth objective (triggering the need for the Board to respond). [Ms.] Flynn's testimony [on behalf of Citizens] stated that the level of residential growth in the Rural Tier exceeds the objective. Given the Board's familiarity with this issue, as demonstrated in *Archers Glen*, it was placed fairly on notice by Flynn's testimony to address the numeric growth objective in this case, as it did in *Archers Glen*. The Commission does not argue, nor could it argue, that the substance of Flynn's point was a surprise to it. In fact, the Commission included spontaneously in the Appendix to its brief here the relevant General Plan Growth Policy Update, which supports Flynn's assertion that the Rural Tier captured well in excess of 1 percent of the County's dwelling unit growth prior to consideration of the subdivision proposal in this case.

*Id.* at 110, 985 A.2d 1160.

### Motion to Dismiss

 Developer moves to dismiss Citizens' appeal on the ground that "[t]his case involves the same parties, the same issue, the same findings of fact by the Planning Board, and added language to the Amended Resolution that is nearly identical to that presented in *Archers [Glen.]* " In Developer's view, "[t]he mere fact that the real properties involved are

located in adjoining subdivisions, does not change that which this Court has already decided," so that "this Court should dismiss this appeal as barred by res judicata and/or collateral estoppel."

Citizens respond that the *Archers Glen* decision "is not dispositive because the facts in this case are materially different[.]" In support, they point out that "this development is a different development," with "a different size and . . . a different number of proposed dwelling units[.]" Moreover, they argue that, whereas in the *Archers Glen* proceedings they did not expressly oppose the subdivision application on the ground that it violated the 1% growth objective, "[c]ounsel learned from those mistakes" and therefore "pressed the 1% growth limitation at every stage of the litigation" concerning the Preliminary Plan for Bennington Farms. As a result, unlike the record reviewed in *Archers Glen,* this "administrative record contains the admission by Mr. Hirsch that the Board failed to perform any calculations to demonstrate that the proposed subdivision conforms with the General Plan's goal of limiting residential growth to less than one percent."

We agree with Citizens that principles of claim and issue preclusion do not bar this appeal. Although they were also parties in the *Archers Glen* litigation, it is undisputed that the Preliminary Plan for Bennington Farms differs from the preliminary plan for Archers Glen, reflecting differences in the location, size, configuration, and timing of the two subdivisions. For that reason, the administrative record adduced with respect to the Bennington Farms Preliminary Plan is not the same administrative record that was reviewed in *Archers Glen.* Given such differences in the evidentiary facts, we deny Developer's motion to dismiss the appeal. *See generally Klein v. Whitehead,* 40 Md.App. 1, 18, 389 A.2d 374 (1978) (res judicata and collateral estoppel principles do not apply when the prior judgment is not predicated on the same evidentiary facts). *Cf., e.g., Seminary Galleria, LLC v. Dulaney Valley Improvement Ass'n,* 192 Md.App. 719, 741–42, 995 A.2d 1068 (2010) (prior denial of application for additional shopping center parking spaces barred subsequent application for addi-

tional spaces at the same shopping center where there was no material change in circumstances).

## I.

### Standing

Citizens argue that "[t]he Planning Board lacks standing to participate in this appeal." Although Citizens petitioned for judicial review and noted this appeal, they posit that "[i]f the Board is not able to appeal its decision" under the applicable statutes governing judicial review of its decisions, "likewise, it should not be permitted to act as a respondent." In their view, even though it is undisputed that Developer has standing to defend this appeal, the issue of whether a decision maker such as the Planning Board has standing to defend its own action is so frequently occurring that this Court should address the question.

We shall decline and follow the Court of Appeals's lead in *Archers Glen. See Archers Glen,* 405 Md. at 53–55, 949 A.2d 639. Because Developer has standing to defend the Planning Board's action, we have no reason to address whether the Planning Board, who is "another party on the same side[,] also has standing." *Id.* at 53, 949 A.2d 639 (citations omitted).

## II.

### Sufficiency of the Board's Factual Findings

Citizens contend that "[t]he Board failed to fulfill its duty to articulate the findings of facts necessary in order to determine whether Bennington Farms warranted approval," because it did not explain "why Bennington Farms was or was not consistent with [the 1% growth] objective[.]" Developer counters that "[t]he language added to the Bennington Farms Amended Resolution is nearly identical to the language added to the Planning Board's resolution in *Archers [Glen* ], which this Court deemed adequate to support the Planning Board's decision in its reported opinion." In Developer's view, "[a]ffirmance of Bennington Farms, based on the identical language

deemed sufficient in *Archers* [*Glen* ], only makes sense given the fact that these properties adjoin each other, and are being appealed by the exact same parties on the exact same issues."

Not surprisingly, the parties also take opposing positions on how the Court of Appeals's decision and rationale in *Greater Baden*, which was filed more than three years after the Board approved the Amended Resolution for Bennington Farms and after briefing in this Court, should impact this appeal. According to Citizens, the Amended Resolution in this case is inadequate under *Greater Baden* because it does not explain how the proposed subdivision affects the 1% growth objective. Developer maintains that *Greater Baden* bolsters its position that the Amended Resolution adequately addresses the 1% growth objective because, unlike the silent resolution disapproved in *Greater Baden*, here the Planning Board explicitly addressed 1% growth limit in the Amended Resolution.

Under the analytical framework established in *Archers Glen* and *Greater Baden*, detailed above, the issue is whether the Amended Resolution sufficiently reflects that the Planning Board considered and explained how the proposed Bennington Farms subdivision plan conforms with the 1% growth objective. In other words, we must determine whether the Planning Board either "offer[ed] some analysis of how the preliminary subdivision plan . . . may impact the long-term growth objective established in the General Plan or explain[ed] why such an analysis or conclusion is not required, as provided in § 24–121(a)(5) of the County Code." *See Greater Baden*, 412 Md. at 107, 985 A.2d 1160.

In *Greater Baden*, the Planning Board failed to make any findings pertaining to the 1% growth objective in its resolution. The *Greater Baden* Court contrasted the silence in that resolution with the language and testimony in the *Archers Glen* record regarding the 1% growth objective, which satisfied both the requirement that the Planning Board must make findings as to how the proposed subdivision affects the 1% growth objective and the requirement that there be substantial evidence in the record to support such a finding. *See id.*

at 103–06, 109, 985 A.2d 1160 ("Unlike what the Planning Board did in considering the numeric growth objective in its second hearing in *Archers Glen,* that Board here did not consider any bearing the Preliminary Plan might have on the growth objective in the Rural Tier.").

In contrast to *Greater Baden,* the Planning Board in this case did not ignore the 1% growth objective. To the contrary, in amending its original resolution, the Board added the following language, which reflects Planning Staff reports and testimony, in the "findings and reasons for [its] decision" section of the Amended Resolution, under the "Community Planning" heading.

Section 24–121(a)(5) of the Subdivision Regulations states: "The plat shall conform to the area master plan, including maps and text, unless the Planning Board finds that events have occurred to render the relevant plan recommendations no longer appropriate or the District Council has not imposed the recommended zoning."

Several elements of the plan, as approved with conditions and as noted in various review referrals, demonstrate conformance to the maps and text of the master plan and general plan. No rare, threatened or endangered species of plants or animals will be impacted by the development. No designated scenic or historic roads will be impacted by the development. Of the approximate 51 acres of woodland conservation require, all will be on-site in the form of existing preservation (88%) and afforestation (12%). All of site's environmentally sensitive area of Patuxent River Primary Management Area (PMA) is conditioned to remain undisturbed. T protect the rural environment, lots along Bald Eagle School Road meet or exceed five acres in size. The permitted smaller lots (less than five acres in size) are located in the interior of the subdivision. Conservation easements are required over the environmental features to additionally provide for the retention of a quasi public open space system. The lotting pattern established provides for the implementation of high-end estate housing. The transportation system was found to meet the minimum level of

service (LOS) C criteria established for the Rural Tier. The private sector builder will be required to fund a portion of the needed infrastructure in the form of fire and rescue facilities. The private sector builder will be require to contribute towards the implementation of a Class III bikeway. The lot sizes conform to the minimum standards established for the O–S zone. The overall project density is consistent with the O–S Zone and the land use recommendation. **The ultimate development of the 19 lots created by this subdivision are [sic] not in conflict with the hundreds of dwelling units envisioned in the Rural Tier over the next approximate 20 years, given one percent of the County's residential growth in that time frame.**

The 2002 General Plan established seven goals for the Rural Tier. While it is acknowledged that this specific property, with this specific development proposal will not retain sustainable agricultural land, nor will it limit non-agricultural uses, it will preserve environmentally sensitive features; it will help to maintain rural character; it will allow for large lot estate residences; it will protect the land owners' equity in their land; and it will maintain the integrity of the rural transportation system.

(Emphasis added.)

Unlike the silent resolution criticized in *Greater Baden,* the Amended Resolution for Bennington Farms contains the highlighted sentence in regard to the 1% growth objective. The disputed issue, therefore, is whether that finding was adequate under the standard articulated in *Greater Baden,* i.e., whether it "offer[s] some analysis of how the preliminary subdivision plan ... may impact the long-term growth objective established in the General Plan or explain[s] why such an analysis or conclusion is not required[,]" *Greater Baden,* 412 Md. at 107, 985 A.2d 1160.

As the *Greater Baden* Court pointed out, we held that the Board in *Archers Glen* made sufficient findings to support its decision to approve the Archers Glen subdivision. *See id.* at 103–04, 985 A.2d 1160. The language we approved in *Archers*

*Glen* is similar to the language used in this Amended Resolution; indeed, the sentence addressing the 1% growth objective, highlighted above, is identical except as to the number of lots. *See Archers Glen,* 176 Md.App. at 301–02, 933 A.2d 405.

Nevertheless, we must resist any temptation to conclude that our decision in *Archers Glen,* as approved in *Greater Baden,* conclusively approves the adequacy of such language under the *Greater Baden* standard for meaningful findings regarding the 1% growth objective. This is because in *Archers Glen,* Citizens did not contend that the Planning Board failed to make adequate findings with respect to the 1% growth objective. *See id.* at 305–06, 318, 933 A.2d 405. We limited our decision to the different question of whether there was substantial evidence in the administrative record to support the broader conclusion that the Board appropriately considered and balanced all objectives in the Master and General Plans. Consequently, neither our decision nor our rationale in *Archers Glen* compels affirmance of the Amended Resolution for Bennington Farms.

On the other hand, lessons learned from *Greater Baden* and *Archers Glen* provide guidance and inform our review. As we read *Greater Baden,* it is clear that mere "lip service" to the 1% growth objective, in the form of a conclusory statement in a resolution, cannot satisfy the Planning Board's obligation to "offer some analysis of how the ... plan may impact" the 1% growth objective. To constitute meaningful consideration of that objective, the *Greater Baden* Court concluded that "it is necessary that the Planning Board at least account for how, if at all, the proposed subdivision might affect residential growth in the Rural Tier, even if some modest assumptions must be made, and more difficult decisions deferred to later in the development process." *Greater Baden,* 412 Md. at 108, 985 A.2d 1160.

Here, we are persuaded that the Amended Resolution satisfies that standard. Albeit briefly, the Board expressly acknowledged the 1% percent growth objective and discussed how the Bennington Farms subdivision would conform to it,

when it stated that "[t]he ultimate development of the 19 lots created by this subdivision [is] not in conflict with the hundreds of dwelling units envisioned in the Rural Tier over the next approximate 20 years, given one percent of the County's residential growth in that time frame." In our view, this indicates that the Board determined that, given the "relatively distant" advent of the 2025 benchmark, it anticipated the addition of "hundreds" of dwelling units in the Rural Tier during that time frame, and that approval of these additional nineteen dwelling units would not result in the total number of approved units in the Rural Tier exceeding that targeted amount.

The Planning Board's finding reflects the principle recognized in *Greater Baden*, that "[a]lthough it is mandatory that the Planning Board consider the numeric residential growth objective, it has leeway in that regard, especially where the 2025 horizon selected in the growth objective remains relatively distant at the present time." *Id.* at 107, 985 A.2d 1160. We cannot say that, when the Board approved this Amended Resolution in July 2006, it was necessarily obligated to "put pen to paper" just four years into the twenty-five year growth period and create a running tally of approved dwelling units in each tier, with such attendant projections as would be necessary to predict how many units ultimately could be added in the Rural Tier by the year 2025 in order to conform to the 1% growth objective.

That is not to say that such projections might not be prudent, and perhaps in time even necessary, particularly as the number of approved dwelling units increases over the course of the designated growth period. But we are not prepared to rule *post hoc* that such calculations were required in this instance. Our holding is narrow. It was enough in the circumstances of the approval for the Board to state that these nineteen units were not inconsistent with the 1% growth objective given the hundreds of units that the Board projected could be built in the Rural Tier, in conformance with the 1% growth objective, over the remaining twenty years of the growth period.

We are not persuaded otherwise by Citizens' complaint that the Planning Board has approved subdivision plans in the Rural Tier at a rate greater than 1% of the total dwelling unit growth in the County.[4] Among the matters on which the Board must be given "leeway" is whether to maintain a steady growth rate over the entire period or whether to "front load" its approval of Rural Tier subdivisions at a higher growth rate in the short term, during the earlier part of the growth period, and thereby defer final decisions regarding the 1% growth objective to later in the development process. *Cf. id.* ("Even assuming residential growth in the Rural Tier in the short term may be in excess of the long term objective, the Board is not compelled necessarily to deny all residential subdivision applications coming before it in the Rural Tier until the desired equilibrium is attained."); *id.* at 108, 985 A.2d 1160 ("[I]it is necessary that the Planning Board at least account for how, if at all, the proposed subdivision might affect residential growth in the Rural Tier, even if some modest assump-

---

**4.** Citizens point to the Commission General Plan Growth Policy Update, published in September 2008, two years after approval of the Preliminary Plan for Bennington Farms, as proof that the Planning Board has not conformed its subdivision approvals to the 1% growth objective. Developer counters that this same document establishes that the total projected dwelling unit growth between 2002 and 2025 is 67,222 units, meaning that 672.22 additional units were projected in the Rural Tier during that period, consistent with the Board's statement in the Amended Resolution that "hundreds" of dwelling units were envisioned for the Rural Tier.

Although this data does indicate that the annual percentage of total dwelling unit completions during the period 2002 through 2007 ranged from 2% to 5%, for a total of 568 units in the Rural Tier, we note that this document was not part of the administrative record now before us and is therefore not factored in our review of the issues before us. In the four year period from 2002 through 2005, before the Board reconsidered its initial approval of the Bennington Farms application, only 391 dwelling units had been completed in the Rural Tier. Although the number of completed units necessarily reflects the number of units approved by the Planning Board, such approvals necessarily occurred sometime before actual completion, so that it impossible to determine from this data how many dwelling units were approved by the Board after the growth period began in 2002 through the date of the Amended Resolution approving the Bennington Farms subdivision plan on July 13, 2006.

tions must be made, and more difficult decisions deferred to later in the development process."). For this reason, the Board was not compelled to deny the Bennington Farms application on the ground that the short-term dwelling unit growth rate in the Rural Tier exceeded the overall long-term objective of a 1% growth rate.

## III.

### Substantial Evidence

We turn, then, to the final issue raised by Citizens— whether there was substantial evidence to support the Board's finding that approval of the Preliminary Plan for Bennington Farms was not inconsistent with the 1% growth objective. "Substantial evidence has been defined as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Archers Glen*, 176 Md.App. at 307, 933 A.2d 405 (citations and internal quotation marks omitted). When the administrative record contains "the facts on which the agency acted or a statement of reasons for its action," the substantial evidence standard has been satisfied. *Id.* (citation and internal quotation marks omitted).

Citizens argues that, even if the Board articulated a sufficient factual basis for its determination that the Bennington Farms subdivision is not inconsistent with the 1% growth objective, "[t]he record lacks substantial evidence that the addition of a 19–house subdivision is consistent with" that objective. At oral argument, Citizens pointed us to the following pages of the hearing transcript from the Planning Board's re-consideration of the Preliminary Plan for Bennington Farms, when Alan Hirsch from the Planning Staff was questioned about how the 1% growth objective applied to that subdivision application.

[Counsel for Citizens]: Now the General Plan, does it not, Mr. Hirsch, [state] that ... less than one percent of the entire residential development in the County will occur in the [R]ural [T]ier?

Mr. Hirsch: It does state that under development patterns, but I think it's important to note that it says "capture a designated percentage of the County's dwelling unit growth by the year 2025 within each tier." And I believe I made a statement with regard to the 19 dwelling units proposed here, that by the time, throughout the years from the adoption of the General Plan through the year 2025, given the rate of growth in this Plan and given the rate of development, that that would envision hundreds of dwelling units within the [R]ural [T]ier at the time this document was prepared.

[Counsel for Citizens]: All right. But in the record from the first hearing is no calculation where you perform, put pen to paper, pencil to paper and calculated and predicted that over 25 years, less than one percent of the residential development would occur in the [R]ural [T]ier. My question, sir, is there such a calculation?

\*　　\*　　\*

Can you point to this Planning Board any calculation in this record that you or another staff member performed to reach the conclusion that less than one percent of development is going to occur in the [R]ural [T]ier? There is no such calculation, is there?

Mr. Hirsch: No, there is no calculation, but that's not what I said. With regard to that statement, what I said was that the ultimate development of the 19 lots created by this subdivision are [sic] not in conflict with the hundreds of dwelling units envisioned in the [R]ural [T]ier over the next approximate 25 years.

[Counsel for Citizens]: How many houses have been approved for Archer's Glen One just to the south?

Mr. Hirsch: That Preliminary Plan was approved for 47 lots.

[Counsel for Citizens]: And if you were to drive on Bald Eagle School Road with this Planning Board for three quarters of a mile in either direction, how many houses would you see?

Mr. Hirsch: I can't answer that question with regard to the existing dwelling units that are there, or even any properties that have a right to develop houses.

[Counsel for Citizens]: All right. And similarly you cannot inform this Board, can you, sir, how many houses have been either built or have been approved in a two mile radius around what we've been calling Bennington Farms.

Mr. Hirsch: No, I cannot. The point I was making is that this subdivision of 19 lots as it relates to its piece of development and its impact on the overall tier.

As the examination continued, Planning Board members asked Citizens' counsel to clarify his clients' grounds for opposing the Preliminary Plan. Counsel responded:

the point I'm trying to convey . . . is that staff and the developer needs to ask this question. What affect will this development have in conjunction with the other developments in the rural tier already built out or approved. What affect will it have on the overall rural character of the [R]ural [T]ier? So my clients say, to answer that question, you need to know what else has been approved or built out in the [R]ural [T]ier. Citing *Coffey v. Md.–Nat'l Capital Park & Planning Comm'n*, 293 Md. 24, 27 [441 A.2d 1041] (1982),[5] counsel then invoked the teacup analogy used by the Court of Appeals, to explain why he believed a "pen to

---

5. In *Coffey v. Md.–Nat'l Capital Park & Planning Comm'n*, 293 Md. 24, 30–31, 441 A.2d 1041 (1982), the Court of Appeals held that it was within the Planning Board's discretion to deny a subdivision application that complied with applicable zoning regulations on the ground that it exceeded density rates in the applicable Master Plan. In doing so, the Court observed that the regulation prohibiting the Planning Board from approving a subdivision plat that did not comply with the Master Plan was as much entitled to obedience as any other legislative enactment. The need for the regulation specifying that a subdivision plan must conform to the master plan can be illustrated by comparison to the putting of water in a teacup drop by drop. After a period of time there comes the drop which will cause the cup to overflow. By analogy, developing some of the lots in conformity with the existing zoning will not disrupt the master plan. Concentrated use and development, however, will disrupt it.
*Id.* at 31, 441 A.2d 1041.

paper" calculation of prior and projected subdivision approvals was necessary. They said, you could have a teacup and you could put a little water in and not violate the Master Plan, a little more in and not violate the Master Plan, but at some point in time the cup is going to overflow. And so that's our point here. The [R]ural [T]ier of course is a very large area, we know that. And if you were to say to me, . . . are you saying that all development in the [R]ural [T]ier is prohibited, I'd say no, it's not. So there's a limited development in the middle of the [R]ural [T]ier that has no adverse [effect] on the rural character, say, 10 houses. . . . But as you increase the number, it gets tougher and tougher. . . .

Citizens argue that Hirsch's admissions that "no calculation had been performed to determine and/or predict the rate of residential growth in the Rural Tier" and that "[n]o investigation was undertaken to determine how many houses had been built or were approved to be built in a two-mile radius around Bennington Farms" compel the conclusion that the record lacks substantial evidence to support the Board's conformance finding. Developer counters that, "[c]ontrary to [Citizens'] understanding of the substantial evidence test, if the findings are adequate to support the agency's conclusion, then there is substantial evidence."

As we discussed in Part II, the Planning Board concluded and explained that the nineteen residences in this subdivision would not be inconsistent with the 1% growth objective because, at the targeted growth rate of 1% in the Rural Tier through 2025, hundreds of additional dwelling units would be added during the remaining twenty years of that period, and the nineteen new residences in Bennington Farms would not conflict with that target. This finding was supported by Mr. Hirsch's testimony using verbatim language. *Cf. Greater Baden,* 412 Md. at 110, 985 A.2d 1160 (Planning Board may rely on staff in making factual findings).

Citizens does not dispute that this testimony supports the Board's finding; instead, they contend that no reasonable

person could accept this imprecise projection as a meaningful measure of whether the Bennington Farms application conflicted with the 1% growth objective. As we discussed in Part II, we are not persuaded that absence of specific projections as to total dwelling unit growth in the Rural Tier through 2025 or the failure to present a comprehensive accounting of previously approved subdivisions in the Rural Tier compel us to vacate the Amended Resolution. Although we do not disagree that at some point during twenty-three year period between 2002 and 2025, the Board must "put pen to paper" in order to calculate where it stands on dwelling unit growth in the Rural Tier, we cannot say that, at the time of this application in 2006, the Board was required to do so with respect to this particular application. Indeed, the "teacup" argument made by Citizens' counsel supports a finding that, at this early point in the projected growth period, such a structured projection was not necessary to conclude that the nineteen dwelling units in Bennington Farms would not be inconsistent with the 1% growth objective.

Citizens also more broadly contend that there is no "evidence that the proposed development complied with the General Plan's objectives" to preserve "the rural character and vistas that now exist" in the Rural Tier by maintaining " 'large amounts of land for woodland, wildlife habitat, recreation and agricultural pursuits[.]' " According to Citizens,

- [t]he undisputed evidence was that the proposed development violated the following objectives of the Master Plan:
- To encourage the continuance of agriculture as an economic activity in the Subregion VI Study Area and a contributor to the County's economic base;
- To support agricultural preservation through a combination of development controls and incentives;
- To promote active participation in the Maryland Agricultural Land Preservation Foundation Program;
- To protect sufficient agricultural land and open space in order to help protect the County's air, water, and land resources;

- To preserve farmsteads, woodlands, wildlife habitat, scenic vistas, and other natural, cultural and historic resources which reflect the rural heritage of the County[.]

As set forth above, the Amended Resolution featured specific findings and conditions that were expressly designed to comply with each of those objectives in the Master Plan, by imposing specified restrictions and obligations. The technical reports of the various Planning staff departments provide substantial evidence that these objectives were not violated given the imposition of such conditions. *Cf. Greater Baden,* 412 Md. at 110, 985 A.2d 1160 ("It is not unreasonable for the Planning Board to rely on a Staff Report ... if the Staff Report is thorough, well conceived, and contains adequate findings of fact.").

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**